**WESTERN CHEMICAL PUMPS, INC., Plaintiff,**

v.

**SUPERIOR MANUFACTURING, INC., an Oklahoma Corporation, and Alan H. Hulva, an individual, Defendants.**

**Civil Action No. 96–2305–EEO.**

United States District Court, D. Kansas.

Dec. 12, 1997.

Michael Yakimo, Jr., D.A.N. Chase, Chase & Yakimo, Overland Park, KS, Ronald S. Reuter, Perry & Renter, L.C., Overland Park, KS, for Plaintiff.

Bernard F. Weinand, Blackwood & Langworthy, L.C., Kansas City, MO, Bart A. Boren, Williams, Luttrell & Boren, Oklahoma City, OK, for Defendant.

### MEMORANDUM AND ORDER

EARL E. O'CONNOR, Senior District Judge.

This is a trade dress infringement, commercial misrepresentation, and unfair competition action. Plaintiff Western Chemical Pumps, Inc. ("Western") contends that defendants Superior Manufacturing, Inc. ("Superior") and Alan H. Hulva infringed the trade dress of two of Western's chemical injection pumps in violation of the Lanham Act, particularly 15 U.S.C. § 1125(a). Western also claims that defendants misrepresented the nature of Superior's chemical injection pumps in its advertisements in violation of the Lanham Act. Finally, Western claims that defendants' actions constitute unfair competition and misappropriation under Kansas law.

On August 27 and 28, 1997, this case came on for trial before the court. After carefully considering the arguments of counsel, the testimony at trial, the exhibits, and the briefing submitted by the parties, the court makes the following findings of fact and conclusions of law as required by rule 52(a) of the Federal Rules of Civil Procedure.

### Findings of Fact

1. Plaintiff Western is a Missouri corporation with its plant facility in Olathe, Kansas.

2. Defendant Superior is an Oklahoma corporation with its principal office in Oklahoma City, Oklahoma.

3. Defendant Alan H. Hulva resides in Edmond, Oklahoma, and is president of Superior. Mr. Hulva owns 100% of the capital stock of Superior.

4. Western filed suit for trade dress infringement and commercial misrepresentation under the Lanham Act, 15 U.S.C. § 1051 et seq., particularly 15 U.S.C. § 1125(a), copyright infringement pursuant to 17 U.S.C. § 1, as well as for unfair competition and misappropriation under Kansas common law.

5. Western manufactures and sells chemical injection pumps, which pump process treatment chemicals either into oil well down holes or into flow lines. The pumps are most frequently found at gas wells or oil wells and at oil tank collection batteries, along pipelines and refineries.

6. Western currently sells, among other products, two types of chemical injection pumps. The model DFF pump is a gas operated pump which is driven by natural gas under pressure available at the well head or in a pipeline.

7. The other Western pump at issue is the model LD, which is a chemical injection pump that is attached to the walking beam of an oil pumping rig. The movement of the walking beam causes the pump to inject chemicals into the oil well hole or a flow line.

8. The model DFF originated with a model DF pump designed by Mr. Orla Watson (now deceased). The DF pump was manufactured and sold by Mr. Watson's com-

pany, Western Machine Company, beginning in 1948.

9. The model DFF in its current configuration has been manufactured and sold since 1969.

10. The model LD also was designed and developed by Mr. Watson and, beginning in 1962, was manufactured and sold by Western Machine Company.

11. On November 26, 1971, Mr. Watson sold his chemical pump business to Western (Western Chemical Pumps, Inc.), a Missouri corporation of which Mr. and Mrs. Leslie L. Simmons were the sole shareholders.

12. The contract for the purchase provided that Western would "acquire furniture, fixtures and patents, goodwill and the right to continue operation of the business," and it was Mr. Simmons' understanding that he was acquiring the pumps, the designs, and the goodwill of the business.

13. In December 1979, Mr. Simmons sold all of the outstanding stock in Western to Thomas J. Seitz, the current owner of all such stock of Western.

14. Western has continued the operation of the business, including the manufacture and sale of the model DFF pump and the model LD pump, from 1972 until the present.

15. Western is the successor to Mr. Orla Watson and Western Machine Company with respect to the manufacture and sale of the model DFF and model LD chemical pumps and as such is the owner of the design and configuration of the model DFF and model LD chemical pumps.

16. Vega Products ("Vega"), a division of Powerseal, manufactured and sold a gas chemical injection pump similar in appearance to Western's DFF pump for three years in the mid to late 1980s. Powerseal is a manufacturer with a full line of oilfield products marketed nationwide.

17. Tri–Chem, from 1986 until 1994, manufactured and sold a beam pump similar in appearance to Western's LD beam pump.

18. Western did not take any action against Vega or Tri–Chem for their use of chemical pumps similar in design to the DFF and LD pumps.

19. Superior's President, Mr. Hulva, prior to deciding on the type of pump to manufacture, studied the market, several pumps, and manufacturers' catalogs.

20. In mid 1995, Superior reverse engineered a gas chemical injection pump by tearing down a Western DFF gas chemical injection pump and a gas chemical injection pump manufactured by Vega. Superior called its pump an "AHH2 pump."

21. Superior also reverse engineered a beam pump by tearing down a Western LD beam pump and a Tri–Chem beam pump. Superior called its pump a "JP pump."

22. The channels of trade and the potential customers for Superior and Western pumps are identical. Customers include primarily oil and gas companies, pipeline companies, oil field supply stores, and chemical companies.

23. Potential customers of the Superior and Western pumps normally do not make a side-by-side comparison of the pumps.

24. Potential and actual purchasers of Western's and Superior's chemical pumps are sophisticated in the oil and gas industry, know oil and gas equipment, and generally have worked in the industry in various capacities.

25. Purchasers of chemical pumps generally understand that many manufacturers make similar looking products in the oil and gas industry.

26. In 1996, the list price of the Western DFF pump was $950 and the list price of the Western LD pump was $345.

27. In 1996, Superior sold its AHH2 pump for $684 and its JP pump for $248.

28. Based on the consumers' experience in the oil and gas industry, the price of the pumps, and the purpose of the pumps, consumers generally exercise a high level of care in purchasing chemical injection pumps.

29. Each year, Western distributes approximately 1,000 general catalogs, 900 brochures for the DFF pump, and 1,600 brochures for the LD pump. Western also advertises its pumps in the *World Petroleum* directory, attends oil shows in connec-

tion with the marketing of its pumps, and assists its distributors in conducting seminars for oil companies in connection with its pumps.

30. Superior clearly labeled its pumps with its trade name, which is stamped into the top plate of the pump (side plate of the JP pump), displayed on a silver colored label which is bolted onto the top plate, and displayed on a silver label affixed to its stand. Superior's pump is delivered to the customer in a box on which its trade name is clearly stenciled on two sides. The model number is also stenciled on one side of the box. An operations manual, clearly indicating that it is Superior's, is included with the pump.

31. Western clearly labeled its pumps with its trade name, which is stamped into the top plate of the pump (side plate of the LD pump), displayed on a silver colored label which is bolted onto the top plate, and displayed on a silver label affixed to its stand. Western's pump is delivered to the customer in a box on which its trade name is clearly stenciled. The model number is also stenciled on one side of the box. An operations manual, clearly indicating that it is Western's, is included with the pump.

32. Both Western and Superior have serial number labels on their pumps which denote manufacturer and place of manufacture.

33. Superior's pumps are painted blue, while Western's pumps are painted green. Certain fixtures on the Superior pumps have a brass colored appearance while Western paints their fixtures green.

34. Both Western and Superior sell their pumps through exclusive manufacturing representatives.

35. Customers generally are aware which company is represented by the various distributors and sales representatives.

36. The AHH2 pump and the JP pump are sold exclusively by and through manufacturing representatives and are invoiced by Superior. The invoices clearly indicate to consumers that they are purchasing a Superior pump. The invoices carry Superior's name and Superior's address.

37. Western also utilizes invoices which denote Western as the manufacturer of its pump.

38. Mr. Russell, an end-user of chemical pumps who had purchased both Western and Superior pumps, testified that Superior's representatives attempted to distinguish its pumps from Western's, primarily on the basis of price. Mr. Russell also testified that Superior did not indicate in any way that it was affiliated with Western during its sales presentation.

39. Mr. Russell testified that he did not believe that the Western and Superior pumps were manufactured by the same company "just because the shape of the pump."

40. In developing the AHH2 pump, Superior intended to manufacture a pump which was simple, with an easy manufacturing design.

41. There are only three basic designs available for a gas operated chemical injection pump: vertical diaphragm, horizontal diaphragm, or drum/barrel.

42. The shape of the Western DFF gas operated pump is a matter of function. The DFF pump primarily operates with a diaphragm and a piston. The size of the diaphragm is dictated by the available gas pressure to the user. The diaphragm must be perpendicular to the piston for the pump to operate properly. The DFF pump also has a stand or pedestal to keep the actual pump out of the mud.

### Conclusions Of Law

■ Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), creates a federal cause of action for trade dress infringement. Section 43(a) provides:

Any person who shall affix, apply, or annex, or use in connection with any goods or services or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce ... shall be liable to a civil action ... by any person who believes that he is or is likely to be damaged by use of

any such false description or representation.

"Trade dress features are those comprising a product's look or image." *See Winning Ways, Inc. v. Holloway Sportswear, Inc.*, 913 F.Supp. 1454 (D.Kan.1996) (citing *Vornado Air Circulation Systems, Inc. v. Duracraft Corp.*, 58 F.3d 1498, 1502 (10th Cir.1995), *cert. denied*, 516 U.S. 1067, 116 S.Ct. 753, 133 L.Ed.2d 700 (1996)). Although "trade dress" originally referred only to the packaging, labeling, and display of a product, trade dress protection now also extends to the design or configuration of the product itself. *See Duraco Prods., Inc. v. Joy Plastic Enterprises, Ltd.*, 40 F.3d 1431, 1452 (3d Cir.1994); *Hartford House, Ltd. v. Hallmark Cards, Inc.*, 846 F.2d 1268, 1271 (10th Cir.), *cert. denied*, 488 U.S. 908, 109 S.Ct. 260, 102 L.Ed.2d 248 (1988).

In the instant action, Western claims that the profiles or silhouettes of its DFF and LD pumps are protectable trade dress. Western argues that its trade dress for the DFF pump has several contributing features, including "a round horizontal casing supported by an upright stand, a rectangular housing on top of the casing, and the positioning of other parts, all of which impart a unique profile or silhouette to the pump even when viewed from a considerable distance." For the LD pump, Western maintains the contributing features of its trade dress include "the proportions of a box or housing, the shape of a fluid end that projects from the housing, and the appearance of the lever arm, all of which impart a distinguishing profile or silhouette to the pump."

To establish infringement of its trade dress, Western must prove that (1) the design of each pump is inherently distinctive or distinctive by virtue of having acquired secondary meaning and (2) there is a likelihood of confusion between Western's and Superior's pumps. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769, 112 S.Ct. 2753, 2757–58, 120 L.Ed.2d 615 (1992); *Vornado*, 58 F.3d at 1502–03; *Duraco*, 40 F.3d at 1439; *Hartford House*, 846 F.2d at 1271. Superior may defend by showing that Western's alleged trade dress is functional and, therefore, may be freely copied. *See Bruns-*

*wick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 517, 520 (10th Cir.1987).

## I. Distinctiveness Of Western's Pumps.

### A. *Inherently Distinctive.*

■ A product's configuration is inherently distinctive if the configuration's "intrinsic nature is such as to 'almost automatically tell a customer that [it] refers to a brand.'" *Vornado*, 58 F.3d at 1502 (quoting *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 162–63, 115 S.Ct. 1300, 1303, 131 L.Ed.2d 248 (1995)). In evaluating the distinctiveness of trademarks, the Tenth Circuit has adopted the traditional categorical (or *Abercrombie*) approach where the trademark is determined to be either (1) generic, (2) descriptive, (3) suggestive, or (4) fanciful or arbitrary. *See Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 939 & n. 5 (10th Cir.1983) (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9–10 (2d Cir.1976)). Trademarks classified as suggestive, fanciful, or arbitrary are considered inherently distinctive and do not require proof that the trademark has acquired secondary meaning. *See Qualitex*, 514 U.S. at 162–63, 115 S.Ct. at 1303 (citing *Abercrombie*, 537 F.2d at 9–10). On the other hand, generic or descriptive trademarks are not considered inherently distinctive. *See id.*

■ Some courts have rejected the categorical approach of *Abercrombie* for product configuration trade dress cases. These courts focus on whether the trade dress is "likely to serve primarily as a designator of origin of the product." *Knitwaves, Inc. v. Lollytogs, Ltd.*, 71 F.3d 996, 1008 (2d Cir. 1995) (quoting *Duraco*, 40 F.3d at 1449). Indeed, the Tenth Circuit's statements in *Vornado* seem to closely track this alternative standard for product configuration trade dress. Other courts, however, continue to apply the *Abercrombie* classifications even in product configuration trade dress cases. *See, e.g., Stuart Hall Co., Inc. v. Ampad Corp.*, 51 F.3d 780, 787–88 (8th Cir.1995). We need not resolve whether the Tenth Circuit in *Vornado* announced a new test for product configuration trade dress cases or whether the traditional categorical approach

should be applied. Under either test, the silhouette of both of plaintiff's pumps is not inherently distinctive.

First, we find that the silhouette of Western's pumps is not inherently distinctive under the categorical approach. We note initially that the silhouette of the DFF or LD pump cannot be termed "fanciful or arbitrary." Fanciful or arbitrary trademarks "bear no relationship to the product or service with which they are associated." *Beer Nuts,* 711 F.2d at 939 n. 5 (quoting *Soweco, Inc. v. Shell Oil Co.,* 617 F.2d 1178, 1184 (5th Cir.1980), *cert. denied,* 450 U.S. 981, 101 S.Ct. 1516, 67 L.Ed.2d 816 (1981)). The court finds that there is definitely a relationship between the silhouette of the DFF and LD pumps and the actual pumps.

The primary issue under the categorical approach is whether the silhouette of Western's pumps is "descriptive" or "suggestive." A descriptive trademark "conveys an immediate idea of the ingredients, qualities or characteristics of the goods" while a suggestive trademark "requires imagination, thought and perception to reach a conclusion as to the nature of goods." *Beer Nuts,* 711 F.2d at 939 n. 5 (quoting *Abercrombie,* 537 F.2d at 11) (internal quotation omitted). In classifying Western's trade dress, we analyze the relation between the product and the trade dress. *See Stuart Hall,* 51 F.3d at 786. "If the specific design of the trade dress is only tenuously connected with the nature of the product, then it is inherently distinctive.... If the design of the trade dress is dictated by the nature of the product, [however,] then secondary meaning must be proven." *Id.* We find that the silhouette of Western's pumps is dictated by the nature of the pumps and that Western's trade dress is best classified as "descriptive." The silhouette of Western's pumps merely shows an ordinary consumer the ingredients, qualities, and characteristics of the chemical injection pumps. The silhouette of the pumps is not suggestive because it does not require imagination, thought, and perception on the consumers' part to reach a conclusion as to the nature of the goods.

We also find that Western's pumps are not inherently distinctive under the standard set forth in *Knitwaves.* The central inquiry under *Knitwaves* is whether the design of the pumps is likely to serve primarily as a designator of origin of the product. *See Knitwaves,* 71 F.3d at 1008. "*Knitwaves* makes it clear that, in order to prevail on a claim for trade dress infringement, a plaintiff must do more than demonstrate that the appearance of its product serves some source identifying function. It must demonstrate that the primary purpose behind the design was to identify its product's source." *Banff Ltd. v. Express, Inc.,* 921 F.Supp. 1065, 1071 (S.D.N.Y. 1995). Here, Mr. Seitz of Western testified that he could not state that the DFF and LD pumps were designed or configured somehow to denote Western Chemical. We also conclude that the inherent characteristics of the pump are not likely to serve as a designator of the pumps' origin. Likewise, we find that the pumps' configuration does not almost automatically tell a customer that it refers to a particular brand, it merely shows the ingredients and characteristics of the pumps. *See Vornado,* 58 F.3d at 1502. For the above reasons, the court finds that Western did not establish that the trade dress of its DFF or LD pumps is inherently distinctive.

### B. *Distinctive By Secondary Meaning.*

■ Without any proof that the trade dress of either the DFF or LD pumps is inherently distinctive, Western must establish that the DFF and LD pumps have acquired secondary meaning. "To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Inwood Labs., Inc. v. Ives Labs., Inc.,* 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 2187 n. 11, 72 L.Ed.2d 606 (1982). Courts consider a variety of factors to determine whether a product has acquired secondary meaning including: (1) consumer testimony or surveys linking the trade dress to a single source, (2) advertising, (3) unsolicited media coverage of the product, (4) exclusivity and length of use, (5) sales success, and (6) intentional copying of the trade dress. *See Stuart Hall,* 51 F.3d at 789; *Duraco,* 40

F.3d at 1452; *Centaur Communications, Ltd. v. A/S/M Communications, Inc.,* 830 F.2d 1217, 1222 (2d Cir.1987). No one factor is dispositive and a plaintiff does not have to present evidence with respect to each factor. *See Centaur,* 830 F.2d at 1222. The above factors are designed to focus the court's attention on the consuming public's perception of the product. *See id.*

### 1. *Consumer Testimony.*

■ Western failed to submit any consumer surveys or direct consumer testimony. Western attempted to present evidence of consumers' recognition of Western's pumps through the testimony of Western's distributors. First, Mr. Wood, a Western distributor, testified that he recognizes the Western DFF and LD pumps by shape when he travels on roads near oil and gas fields in a sales effort to determine the type of pump being used in the field. Notably, Mr. Wood did not testify that his customers recognize a DFF or LD pump by its shape or that customers associate the shape of the pumps with a single source. Secondary meaning certainly cannot be proven by showing that a salesman of Western pumps can recognize the shape of Western pumps in determining his potential customers. *See Major Pool Equipment Corp. v. Ideal Pool Corp.,* 203 U.S.P.Q. 577, 583, 1979 WL 25007 (N.D.Ga.1979) ("Common sense acknowledges such recognition by these men, as it would predict that, for example, Cadillac salesmen would associate late-model Cadillac features with their parent company. Such recognition is not the consumer designation of origin which 15 U.S.C. § 1125(a) intends to test."). Mr. Wood certainly would recognize the configuration of Western's pumps and associate their configuration with Western due to his long-standing relationship with Western. Such anecdotal testimony is not persuasive.

Next, Mr. Greer, another Western distributor, testified that he believes that customers recognize Western pumps by shape. Based on Mr. Greer's relationship to Western and the lack of concrete evidence supporting his opinion, we will give Mr. Greer's testimony very limited weight. *See Self-Realization Fellowship Church v. Ananda Church of Self-Realization,* 59 F.3d 902, 910 (9th Cir. 1995) ("Trademark law is skeptical of the ability of an associate of a trademark holder to transcend personal biases to give an impartial account of the value of the holder's mark."). The testimony of a Western distributor as to his impression of how a customer recognizes a Western pump is a far cry from direct consumer testimony or consumer surveys, which generally are the most persuasive and desirable evidence of secondary meaning. *See Bonny Prods., Inc. v. Robinson Knife Mfg. Co.,* 14 U.S.P.Q.2d 1666 (S.D.N.Y.1989).

Only one end-user of chemical pumps, Mr. Russell, testified at trial. Mr. Russell, who had purchased both Western and Superior pumps, testified that he did not believe that the Western and Superior pumps were manufactured by the same company "just because the shape of the pump." In sum, Western has not presented any direct evidence that consumers associate Western's trade dress with a single source.

### 2. *Advertising.*

■ Western presented evidence that each year it distributes approximately 1,000 general catalogs, 900 brochures for the DFF pump, and 1,600 brochures for the LD pump. Western also advertises its pumps in the *World Petroleum* directory, attends oil shows in connection with the marketing of its pumps, and assists its distributors in conducting seminars for oil companies in connection with its pumps. We note that plaintiff's advertising expenditures are "measured primarily with regard to those advertisements which highlight the supposedly distinctive, identifying feature." *Duraco,* 40 F.3d at 1452; *see First Brands Corp. v. Fred Meyer, Inc.,* 809 F.2d 1378, 1383 (9th Cir.1987) ("[T]he advertising and promotional activities must involve 'image advertising,' that is, the ads must feature in some way the trade dress itself.") (quoting *Brooks Shoe Mfg. Co., Inc. v. Suave Shoe Corp.,* 716 F.2d 854, 860 (11th Cir.1983)); *Winning Ways,* 913 F.Supp. at 1470.

Western has not presented any evidence that its advertisements emphasize the trade dress of the DFF or LD pumps. No effort is

made by Western to emphasize the overall appearance of either pump to identify the pumps as Western's pumps as compared to the pumps themselves. In fact, potential purchasers are directed to the text of the catalogs (above the pictures of the pumps) and the word marks used in connection with the pumps. "Where a configuration of a product is displayed with or identified by word marks, the burden to show that the configuration serves a trademark function is greater, since the usual way for consumers to identify and distinguish the source of products is by marks that can be verbalized." 3 Louis Altman, Callmann, Unfair Competition, Trademarks & Monopolies § 18.12 at 136 n. 2 (4th Ed.1983); *see Aromatique, Inc. v. Gold Seal, Inc.,* 28 F.3d 863, 871 (8th Cir. 1994) ("The advertisements submitted with the application cannot establish secondary meaning because they do not separate the claimed dress of the products from the other marks that serve to identify the products"). We find that Western has failed to show that it has advertised the DFF or LD pumps in a manner that emphasizes the alleged trade dress of the pumps.

### 3. *Unsolicited Media Coverage.*

■■■ Mr. Seitz testified that Western received some unsolicited media coverage including television news spots of Western's displays at oil field equipment shows and coverage of Western's products in various technical journals. The court finds that Western received little unsolicited media coverage. More importantly, there is no evidence that (1) the media coverage included the DFF or LD pumps, (2) the profile of either pump was depicted, or (3) any potential customers observed the media coverage. Given the vague testimony regarding media coverage, the court will give very little weight to this factor. *See Winning Ways,* 913 F.Supp. at 1471 (plaintiff's evidence of media coverage failed to show how often photographs of the product appeared in magazines, how the product was chosen, or how the product was displayed in the photographs).

### 4. *Exclusivity And Length Of Use.*

■■■ Western has been the exclusive manufacturer of the DFF and LD pump designs since it acquired the business from Mr. Watson in 1971 with two exceptions. Vega manufactured and sold a pump similar in appearance to the DFF pump for three years in the mid to late 1980s. Tri–Chem manufactured and sold a beam pump similar in appearance to the LD pump from approximately 1986 until 1994 when Western purchased the unused inventory of the company. Western did not take any formal action against Vega or Tri–Chem for their use of chemical pumps similar in design to the DFF and LD pumps.

With respect to the LD pump, the fact that Western did not formally object to Tri–Chem's design tends to lessen the inference of secondary meaning. *See Wallpaper Mfrs. Ltd. v. Crown Wallcovering Corp.,* 680 F.2d 755, 766 (C.C.P.A.1982) ("Without question, distinctiveness can be lost by failing to take action against infringers. If there are numerous products in the marketplace bearing the alleged mark, purchasers may learn to ignore the 'mark' as a source identification."); *Rossner v. CBS, Inc.,* 612 F.Supp. 334, 339 (S.D.N.Y.1985). The presence of Tri–Chem's competing pump decreases the consumers' association between the shape of Western's LD pump and a single source. Although an owner is not required to act immediately against every possible infringing use, Tri–Chem manufactured and sold a beam pump similar to the LD pump for nine years until Western finally purchased the unused inventory of Tri–Chem. With respect to the DFF pump, Western's failure to take formal action against Vega is less significant because Vega's competing pump was relatively short-lived. *See Wallpaper Mfrs.,* 680 F.2d at 766. In sum, Western's near exclusive use of the DFF and LD pumps is one factor in favor of a finding of secondary meaning which is only slightly weakened in the case of the LD pump by Western's failure to take formal action against Tri–Chem's manufacture and sale of a similar pump.

### 5. *Amount Of Sales And Number Of Customers.*

■■■ Western has provided evidence of its annual sales of the DFF and LD pumps since

the 1960s. Western's annual and total sales for the two pumps appears to be quite significant. We note, however, that without a comparison with the sales of other pumps or an analysis of Western's market share attributable to these two pumps, the court cannot analyze fully the significance of Western's sales figures. *See Winning Ways*, 913 F.Supp. at 1472 ("Under these circumstances, the court concludes that while the raw sales figures are evidence of secondary meaning in the relevant professional buyer markets, the weight of this evidence must be discounted by plaintiff's failure to provide the court with a basis to evaluate fully the market penetration that these sales represent."). In addition, a significant amount of sales alone does not indicate that Western's trade dress has acquired secondary meaning. *See Aromatique, Inc.*, 28 F.3d 863, 873 ("Because the proper inquiry is whether the evidence demonstrates that the purchasing public identifies the asserted mark with the source of the product, sales figures alone are inadequate to establish a connection between a product and its source.") (citation omitted); *Winning Ways*, 913 F.Supp. at 1472 ("[S]ales figures are subject to numerous interpretations"). Thus, the amount of Western's sales is only limited evidence of secondary meaning.

### 6. *Proof Of Intentional Copying.*

 Western argues that proof of copying alone may be sufficient to establish secondary meaning. *See Hartford House*, 647 F.Supp. at 1542. This general rule, however, is not applied to product configuration trade dress cases. In *Winning Ways*, Judge Lungstrum explained that "some nonfunctional product configurations may be freely copied" and therefore "the Tenth Circuit would not adopt an ipso facto test, *i.e.* copying of a non-functional feature equates to almost conclusive evidence of secondary meaning in a product configuration case." *Winning Ways*, 913 F.Supp. at 1472. Superior's copying of the design of Western's pumps would be evidence of secondary meaning if Superior intended to (or actually did) confuse consumers as to the source of the product. If Superior copied the design of Western's pumps to take advantage of an efficient design, however, Superior's copying would not establish secondary meaning. *See Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 658 (7th Cir.1995) ("On the one hand then, trademark law allows a producer to prohibit the copying of a product feature which serves as a signifier of source in order to preserve his reputation and the goodwill consumers have for his brand. On the other hand, effective competition and the penumbra of the patent laws require that competitors be able to slavishly copy the design of a successful product.").

Here, Superior did not intend to cash in on Western's goodwill by passing off Superior's pumps as Western's. Superior took several steps to clearly identify and label its pumps. Mr. Russell testified that Superior's representatives attempted to distinguish its pumps from Western's primarily on the basis of price. Mr. Russell also testified that Superior did not indicate in any way that it was affiliated with Western. Accordingly, the court finds that Superior's copying of Western's pumps is not probative evidence of secondary meaning. *See Thomas & Betts*, 65 F.3d at 663 ("Copying is only evidence of secondary meaning if the defendant's intent in copying is to confuse consumers and pass off his product as the plaintiff's."); *see Aromatique*, 28 F.3d at 871 ("Because of [defendant's] conspicuous use of its own trademarks, therefore, it was clearly erroneous to infer from [defendant's] copying of [plaintiff's] product that the marks at issue here had acquired secondary meaning.").

### 7. *Balancing Of Secondary Meaning Factors.*

██ Consumer testimony and surveys are the only direct evidence of secondary meaning. The court finds that the absence of such evidence in this case strongly suggests that Western has not established that customers identify the shape of Western's pumps with a single source. Indeed, Mr. Russell, the only end-user to testify, did not identify Western's pumps by their shape. Mr. Russell acknowledged that he did not think Western and Superior were associated with each other just because of the shape of their pumps.

Western has presented some circumstantial evidence of secondary meaning. This evidence, however, is insufficient for the court to conclude that Western's trade dress has acquired secondary meaning. First, Western's evidence of advertising and media coverage is very weak. There is no evidence that Western's advertisements or media coverage emphasized the silhouette or appearance of the DFF or LD pumps. In addition, the prominent display of word marks to identify Western's pumps on its sales literature suggests that consumers rely on these marks for source identification.

Next, we find that Western's evidence of sales success has little probative value because it has been presented in a vacuum. Western has not presented any framework to evaluate the significance of its sales. Further, Superior's intent in copying Western's pumps is given very little weight because there is no evidence that Superior intended to (or actually did) confuse consumers or pass off its product as Western's. Finally, we note that Western's best evidence of secondary meaning is its exclusivity and length of use of the DFF and LD pumps. Western has been the exclusive manufacturer of both the DFF and LD pumps since at least 1971 with the exception of the Vega and Tri-Chem pumps. Western's near exclusive use of the DFF and LD pumps is strong circumstantial evidence of secondary meaning, but this evidence is outweighed by the lack of consumer testimony or surveys and the weak evidence with respect to the other secondary meaning factors. In sum, Western has failed to show that in the minds of consumers, "the primary significance of [its] product [design] is to identify the source of the product rather than the product itself." *Inwood Labs.*, 456 U.S. at 851 n. 11, 102 S.Ct. at 2187 n. 11.

## II. Likelihood Of Confusion.

 The plaintiff in a trade dress action must show that "potential customers are likely to be confused by the defendant's trade dress into thinking that the defendant is affiliated, connected or associated with the plaintiff or that the defendant's goods originated with, or are sponsored or approved by the plaintiff." *Vornado*, 58 F.3d at 1502–03.

Likelihood of confusion is not limited to confusion on the part of the direct purchaser of the product but also includes likelihood of post-sale confusion, arising when consumers, other than direct purchasers, view the product in use and are misled. *See Payless Shoesource, Inc. v. Reebok Int'l. Ltd.*, 998 F.2d 985, 989 (C.A.Fed. (Kan.) 1993). Courts consider a number of factors to determine likelihood of confusion including (1) the degree of care likely to be exercised by purchasers, (2) the degree of similarity between the designation and the trademark or trade name, (3) the relation in use and manner of marketing between goods and services marketed by the actor and those marketed by the other, and (4) the intent of the actor in adopting the designation. *See Payless*, 998 F.2d at 988 (citing *Beer Nuts*, 711 F.2d at 940) (quoting Restatement of Torts § 729 (1938)). Western must demonstrate that Superior's sale of its pumps creates a likelihood of confusion on the part of an appreciable number of ordinary purchasers exercising due care in the circumstances. *See Versa*, 50 F.3d at 200; *Nikon, Inc. v. Ikon Corp.*, 987 F.2d 91, 94 (2d Cir.1993); *General Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 626 (8th Cir.1987); *see also Avrick v. Rockmont Envelope Co.*, 155 F.2d 568, 572 (10th Cir.1946) ("It is the generally accepted rule that a designation is confusingly similar to a trade-mark if an ordinary prospective purchaser, exercising due care in the circumstances, is likely to regard it as coming from the same source as the trademarked article.").

### A. Point Of Sale Confusion.

 We first address the likelihood of confusion on the part of purchasers of Western's and Superior's pumps at the point of sale. Purchasers include primarily oil field supply stores, oil and gas companies, pipeline companies, and chemical companies. Consumers likely will exercise a high level of care in purchasing chemical injection pumps because of the consumers' experience, the price of the pumps, and the purpose of the pumps. Mr. Greer testified that most of his customers are high school educated and have worked in different supply stores before working their way up to their current position. Individuals who have

worked in oil equipment supply stores and then further in the oil and gas field are sophisticated purchasers of chemical pumps. Several witnesses testified that consumers in the chemical injection pump market usually understand that different manufacturers make products with similar designs. Accordingly, consumers generally will not be fooled by competing pumps that look alike from a distance. *See Dorr–Oliver, Inc. v. Fluid–Quip, Inc.*, 94 F.3d 376, 383 (7th Cir. 1996) ("where product configurations are at issue, consumers are generally more likely to think that a competitor has entered the market with a similar product"). The price of the pumps (approximately $650 to $950 for the gas diaphragm pump and $250 to $350 for the lever driven pump) also suggests that consumers will exercise a high level of care in purchasing the products. "'[E]very product has its own separate threshold for confusion of origin.' The greater the value of an article the more careful the typical consumer can be expected to be; the average purchaser of an automobile will no doubt devote more attention to examining different products and determining their manufacturer or source than will the average purchaser of a ball of twine." *McGregor–Doniger, Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1137 (2d Cir.1979) (quoting *Taylor Wine Co. v. Bully Hill Vineyards, Inc.*, 569 F.2d 731, 733 (2d Cir.1978)). In addition, chemical injection pumps are essential to the proper handling and processing of oil and gas. Customers likely will exercise a high level of care to ensure that valuable oil and gas products do not become contaminated or require re-processing. *See Versa*, 50 F.3d at 204 ("The more important the use of a product, the more care that must be exercised in its selection.").

Western argues that there is a significant number of unsophisticated purchasers of chemical pumps that likely are confused. Mr. Seitz of Western testified that 50% of the people that purchase chemical pumps have never seen a chemical pump. The purchasers who have never seen a chemical pump before purchasing one certainly are not confused by the similar design of the Western and Superior pumps. Potential customers generally do not make a side-by-side comparison of the pumps because each pump is sold through exclusive distributors. Most of the other purchasers of pumps are familiar with oil and gas equipment and understand that there are a number of manufacturers with pumps that have similar configurations.

Next, we evaluate the similarity of appearance between Western's and Superior's pumps. In product configuration cases, similarity of appearance does not by itself suggest a likelihood of confusion. *See Versa*, 50 F.3d at 202. Consumers generally rely on the word marks used with a product as indicators of source rather than the shape or appearance of a product. *See id.* Therefore, the court also must consider the products' labels, packaging, and advertisements in determining "similarity of appearance." *See id.* at 203.

Superior's pumps are painted blue with a few specific parts that are brass. Western's pumps are painted green including some of the specific parts that are brass on the Superior pumps. The silhouette of Western's and Superior's pumps is virtually identical. The advertising, packaging, and word marks utilized in marketing the competing pumps, however, are clear indicators of their source. Clear labeling in oil and gas products sold to sophisticated purchasers tends to negate any likelihood of confusion as to product source based on configuration. *See Versa*, 50 F.3d at 202–03. "The most common and effective means of apprising intending purchasers of the source of goods is a prominent disclosure on the container, package, wrapper, or label of the manufacturer's or trader's name *** [and when] that is done, there is no basis for a charge of unfair competition." *Litton Sys., Inc. v. Whirlpool Corp.*, 728 F.2d 1423, 1446 (Fed.Cir.1984) (quoting *Venn v. Goedert*, 319 F.2d 812, 816 (8th Cir.1963)); *see Duraco*, 40 F.3d at 1453 ("The inference of unfair competition will be even weaker where the [alleged infringer] takes conspicuous steps-whether in packaging, trademark, marketing techniques, or otherwise-to distinguish its product from its competitor's."); *Bose Corp. v. Linear Design Labs, Inc.*, 467 F.2d 304, 309 (2d Cir. 1972) ("[T]here is hardly likelihood of confusion or palming off when the name of the manufacturer is clearly displayed."). The

permanent labels on both Western's and Superior's pumps are clear indicators of source. Both companies also clearly label their boxes, as well as their invoices and purchase orders.

The manner of marketing of the pumps also suggests that there is little likelihood that direct purchasers are confused as to the origin of the pumps. Both Western and Superior market their pumps through catalogs and independent sales representatives to sophisticated purchasers. Western's catalogs prominently identify it as the source of the DFF and LD pumps. Likewise, Superior's catalogs identify it as the source of the AHH2 and JP pumps. Although both Western and Superior also sell their pumps through sales representatives, they utilize different distributors and each utilize specific invoices on the sale of each pump to identify the source of the pump. The evidence presented showed those who purchase the types of pumps at issue are well aware of which company the sales representatives represent. With the marketing efforts of both Western and Superior, consumers are able to ascertain that the DFF and LD pumps are manufactured by Western and the AHH2 and JP pumps are manufactured by Superior.

■ Finally, Superior's intent in manufacturing the AHH2 and JP pumps suggests that there is little likelihood of confusion. Superior intended to manufacture a pump which was simple, with an easy manufacturing design. No intent to confuse has been proven by Western. In the product configuration context, a defendant's intent weighs in favor of a finding of confusion if intent to confuse or deceive consumers is demonstrated and where the product's labeling and marketing also are misleading. *See Versa Products*, 50 F.3d at 207; *see also Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 382 (2d Cir.1997) (no likelihood of confusion between parties' identical outdoor furniture lines, since labels affixed to furniture clearly identifies manufacturer and since labeled with parties' names; "[t]hese market realities make confusion improbable, even though the two product lines compete in the same market"); Restatement (Third) of Unfair Competition, § 22 comment c. ("if the actor reasonably believes that the other design is functional ..., proof that the actor intentionally copied the other's design does not justify an inference of confusion").

Western did present some evidence of actual customer confusion. Mr. Greer testified that he had "instances where people thought they were getting a Western and they find out later it's not." There is no evidence, however, explaining why these particular customers were confused or that these customers actually purchased a Superior pump. If a purchaser thought he was getting a Western pump and later discovered he had a Superior pump, then the purchaser apparently failed to look at Superior's name which is denoted on the top plate of the pump, on a silver label affixed to the stand, in raised casting on the top (or side) of the pump, on the side of the box containing the pump, and on the operation's manual for the pump. Mr. Greer also testified that one oil pumper mistakenly believed that a Western pump did not operate properly because of a defective part when such part was not Western's. Mr. Greer did not specifically identify the individual who was misled, how the individual was misled, or whether the defective part was in fact Superior's. In light of the vague testimony regarding customer confusion and the clear labels on Superior's pumps and packaging, we cannot conclude that there is a likelihood that ordinarily prudent consumers would be confused. *See Vitek Sys., Inc. v. Abbott Labs.*, 675 F.2d 190, 193 (8th Cir.1982) (district court properly gave little weight to witnesses' testimony that "customers had told them that they were confused by the similarity of the marks").

For the above reasons, the court finds that Western has failed to establish that there is a likelihood of confusion by purchasers at the point of sale of Western's and Superior's pumps.

### B. *Post–Sale And Initial Interest Confusion.*

■ The closer issue in this case is whether Western has established a likelihood of "post-sale" confusion. Post-sale confusion "refers to the association consumers might make between the allegedly infringing item and the familiar product, thereby influencing

their purchasing decisions." *Insty\*Bit, Inc. v. Poly–Tech Indus., Inc.*, 95 F.3d 663, 671 (8th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1085, 137 L.Ed.2d 219 (1997). The Federal Circuit has held that "consideration of post-sale confusion in determining likelihood of confusion is not inconsistent with Tenth Circuit trademark law and would likely be adopted by the Tenth Circuit if it considered the issue head-on." *Payless,* 998 F.2d at 989 (citation omitted); *see Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 872 (2d Cir.1986). In *Lois Sportswear,* the court recognized the potential for post-sale confusion where a "consumer seeing the familiar stitching pattern [on defendant's jeans] will associate the jeans with [plaintiff Levi] and that association will influence his buying decisions." *Id.* at 873. The Eighth Circuit has recognized the potential for post-sale confusion where consumers are "first exposed to [plaintiff's] products in use (that is, outside of the package) and then go to a distributor to find these tools by attempting to match the products on the shelves with the ones they are seeking." *Insty\*Bit,* 95 F.3d at 672. Western has described post-sale confusion in this case as customers who either (1) observe the silhouette of Western's pumps in the field and then purchase a Superior pump on the mistaken belief that the Superior pump is manufactured by or somehow associated with the Western pump observed in the field or (2) do not purchase a Western pump because of a negative experience with a Superior pump (which has a similar silhouette to Western's pump).

Both of Western's post-sale confusion claims are premised on the assumption that individuals purchase chemical injection pumps by reference to shape. For example, Western argues that purchasers of the pumps at issue include "roustabouts" who may purchase pumps based on the shape of the pump in the distributor's store compared to the pump they observed in the field. Western points to the following excerpts of testimony in support of its argument:

Q: When they come in, do they know they want a Western or do they ask for—what other type of pumps you sell?

A (by Glen Wood): Well, that's the only regular chemical injector we sell. But they don't necessarily come in wanting a Western because we have been selling the pumps since 1957, so they may actually come in wanting one of Beal Equipment's [pumps], whatever we've got on display, going by appearance.

\* \* \* \* \* \*

Q: And what is the customer going to see if he goes into a supply store and they have a Superior pump there?

A (by Scott Greer): He's going to see a Western.

Q: Why do you believe that?

A: Because of the shape.

The above testimony establishes that there is a "potential" for confusion, but it certainly does not establish that there is a likelihood of confusion. *See Versa,* 50 F.3d at 200–01 (possibility of confusion insufficient). Neither Mr. Wood nor Mr. Greer testified that individuals initially purchase chemical injection pumps based on the shape of the pumps they observe in the field. As the Seventh Circuit noted, the Lanham Act seeks to avoid "customer confusion when choosing to purchase, or not purchase, the items, not public confusion at viewing them from afar." *Dorr–Oliver,* 94 F.3d at 382 (quoting *Nike, Inc. v. Just Did It Enterprises,* 6 F.3d 1225, 1229 (7th Cir.1993)). The court finds no probative evidence that an appreciable number of ordinary customers purchase chemical pumps based on the shape of the pump the customer observes in the field.

Mr. Greer testified that he received a Western LD pump that had been painted blue leading him first to believe he had a Superior JP pump. Notably, Mr. Greer stated that he looked at the serial number tag to determine the actual manufacturer. Mr. Greer's statements also establish that color is one way to identify chemical injection pumps but that neither shape nor color is determinative of source in the chemical injection pump market.

As with point of sale confusion, we think that the clear labeling and packaging on both Western's and Superior's products negates any likelihood of post-sale confusion. Unlike

most of the labels attached to jeans, the labels affixed to Western's and Superior's pumps are permanent. Thus, post-sale confusion is unlikely. *See L.A. Gear,* 988 F.2d at 1134; *cf. Lois Sportswear,* 799 F.2d at 873.

■ We briefly examine the tangential issue of "initial interest" confusion. The Second Circuit recognized the potential for initial interest confusion where a potential purchaser of petroleum products listens to a sales pitch based on confusion as to the manufacturer (which has been created by similar trademarks). *See Mobil Oil Corp. v. Pegasus Petroleum Corp.,* 818 F.2d 254, 260 (2d Cir.1987). Injury from initial interest confusion can result even though the purchaser may not be confused as to the actual manufacturer at the time the transaction is consummated. *See id.* The injury suffered is that an infringer may be able to get its foot in the door with potential customers and have the customer foreclose consideration of the primary trademark holder's products even after the customer understands that there are two separate manufacturers.

Here, initial interest confusion refers to potential purchasers that are misled into an initial interest in Superior's pumps based on the shape of Western's pumps. The record is void of any evidence suggesting that customers were lured initially to Superior by confusion between Western's and Superior's pumps or the shape of Western's pumps. The record evidence actually suggests that Superior took great strides to distinguish itself as a competitor of Western. We also note that initial interest confusion is unlikely in this case given the high price of chemical injection pumps and the fact that consumers are aware that many manufacturers make pumps with similar configurations. *Cf. Sara Lee Corp. v. Kayser–Roth Corp.,* No. 6:92CV00460, 1992 WL 436279, at *24 (M.D.N.C. Dec.1, 1992) ("In the present case this risk of initial confusion is particularly high since the product [pantyhose] is a low priced item that consumers often only take seconds to purchase.").

For all of the above reasons, the court concludes that Western has not established that potential customers are likely to be confused by Superior's trade dress.

### III. Functionality.

■ Superior maintains that Western bears the burden to establish that its trade dress is non-functional pursuant to the Supreme Court's decision in *Two Pesos.* The defendant in *Vornado* raised the same issue, but the Tenth Circuit specifically declined to address the issue because the defendant did not raise the issue in its earlier appellate brief. *See Vornado,* 58 F.3d at 1503 n. 10. In *Two Pesos,* the Court held that "[i]t is also clear that eligibility for protection under § 43(a) depends on nonfunctionality." 505 U.S. at 769, 112 S.Ct. at 2758. The Court first cited Justice White's concurring opinion in *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 863, 102 S.Ct. 2182, 2193, 72 L.Ed.2d 606 (1982). In *Inwood Laboratories,* Justice White seemed to favor the position that defendant bears the burden of proof on the issue of functionality. *See id.* at 862–83, 102 S.Ct. at 2192–93 ("[A] finding of functionality offers a complete affirmative defense.... [F]unctionality is a defense to a suit under § 43(a) of the Lanham Act."). The other cited references in *Two Pesos,* however, included two appellate decisions that place the burden of proof on the defendant and three appellate decisions that place the burden of proof on the plaintiff. *See Brunswick,* 832 F.2d at 517 (plaintiff); *First Brands,* 809 F.2d at 1381 (defendant); *Stormy Clime Ltd. v. ProGroup, Inc.,* 809 F.2d 971, 974 (2d Cir.1987) (plaintiff); *Am-Brit, Inc. v. Kraft, Inc.,* 812 F.2d 1531, 1535 (11th Cir.1986) (defendant); *American Greetings Corp. v. Dan–Dee Imports, Inc.,* 807 F.2d 1136, 1141 (3d Cir.1986) (defendant). In light of the Supreme Court's statement in *Two Pesos* which does not specify who bears the burden of proof coupled with the Supreme Court's citation to decisions which have placed the burden of proof on opposite parties, we conclude that the Supreme Court did not intend to resolve the circuit conflict on this issue. Accordingly, we will continue to follow the clear Tenth Circuit precedent of *Brunswick,* which places the burden of proof on defendant to establish that plaintiff's alleged trade dress is function-

al. *See Brunswick,* 832 F.2d at 520 ("The trial court correctly imposed the burden of proof of functionality on defendant.").

Trade dress protection does not extend to the functional elements of a product. *See Hartford House,* 846 F.2d at 1272–75. The test for functionality is "whether the protection of the configuration would hinder competition or impinge upon the rights of others to compete effectively in the sale of goods." *Brunswick,* 832 F.2d at 519 (quoting *Sno–Wizard Mfg., Inc. v. Eisemann Prods. Co.,* 791 F.2d 423, 426 n. 3 (5th Cir.1986)). A product feature is functional, and therefore unable to serve as trade dress, if it is essential to the use or purpose of the article or if it affects the cost or quality of the article such as would put competitors at a significant non-reputation-related disadvantage. *See Qualitex,* 514 U.S. at 165, 115 S.Ct. at 1304 (citing *Inwood Labs.,* 456 U.S. at 850 n. 10, 102 S.Ct. at 2186–87 n. 10). Copying a functional attribute is a legitimate competitive activity. *See Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 164, 109 S.Ct. 971, 984, 103 L.Ed.2d 118 (1989).

"A design may be functional if it is one of a limited number of superior designs." Restatement (Third) of Unfair Competition § 17, comment b (1995). The availability of alternative designs alone does not establish that the design of a product is nonfunctional. Rather, the alternative designs must effectively eliminate a competitor's need for the features that plaintiff is asserting as protectable product configuration. *See Elmer v. ICC Fabricating, Inc.,* 67 F.3d 1571, 1580 (Fed.Cir.1995). As the Federal Circuit has noted:

> That another type of design would work equally well does not negate that [this] design was designed functionally to enhance or at least not detract from the rest of the system.... If the feature asserted to give a product distinctiveness is the best, or at least one of a few superior designs for its de facto purpose, it follows that competition is hindered.

*In re Bose Corp.,* 772 F.2d 866, 872 (Fed.Cir. 1985).

In this case, the court finds that the shape of Western's DFF pump is functional and that the design of the pump is simple and cost effective, which is the primary reason Superior chose the configuration. The shape of the Western DFF pump is a function of the diaphragm and piston. All diaphragms are round and the size of the diaphragm is large on Western's DFF pump to work at low gas pressure. Likewise, the positioning of the rectangular housing on the top of the pump is dictated by the positioning of the diaphragm and piston. It is impractical to design this type of pump in such a manner so as to locate the piston in any position other than perpendicular to the diaphragm. In addition, the stand or pedestal on the pump is designed to keep the actual pump out of the mud. Several witnesses testified that there are only three basic designs available for gas operated chemical injection pumps: vertical diaphragm, horizontal diaphragm, or drum/barrel pump. We find that the design feature (silhouette) incorporating the various structures affects the cost or quality of the pump. Accordingly, the court concludes that the shape of Western's DFF pump is one of only a few superior designs and therefore is functional. *See Qualitex,* 514 U.S. at 165, 115 S.Ct. at 1304.

With respect to the Western LD pump, Superior has failed to meet its burden to establish that the alleged trade dress is functional. Superior simply did not present any evidence to show that the shape of the LD pump is dictated by function or it is one of only a few superior designs.

On Western's trade dress infringement claims, the court concludes that judgment in favor of defendants is appropriate because Western failed to establish (1) its trade dress is inherently distinctive or distinctive by proof of secondary meaning and (2) there is a likelihood of confusion between Western's and Superior's pumps. In addition, judgment in favor of defendants is appropriate with respect to the DFF pump because Western's trade dress is functional.

## IV. Commercial Misrepresentation.

Western alleges that Superior's one page flyer regarding the AHH2 pump is a

commercial advertising misrepresentation in violation of section 43(a)(1) of the Lanham Act. To prevail on its claim, Western must establish (1) Superior's advertisement is either literally false or the advertisement, though literally true, is likely to mislead and confuse consumers and (2) it will suffer irreparable harm absent an injunction. *See McNeil–P.C.C., Inc. v. Bristol–Myers Squibb Co.,* 938 F.2d 1544, 1548–49 (2d Cir.1991). Western argues that if it proves that Superior's advertisement is false, irreparable harm is presumed. Western improperly relies on two cases for this proposition: *McNeil, supra* and *McNeilab, Inc. v. American Home Products Corp.,* 848 F.2d 34, 38 (2d Cir.1988). In both cases, the court held that irreparable harm may be presumed if the challenged advertisement directly, but falsely, proclaims the superiority of defendant's product over plaintiff's product. *See McNeil,* 938 F.2d at 1549; *McNeilab,* 848 F.2d at 38. Here, Superior's advertisement does not refer directly to Western or even competitors generally. Accordingly, no presumption of irreparable harm is appropriate in this case.

Western has not met either element of a commercial misrepresentation claim. First, the court concludes that Western has not established that Superior's advertising flyer was false. Western merely questions Superior's claims of quality and dependable service. Moreover, Western has not presented any evidence of irreparable harm. Accordingly, the court will enter judgment in favor of defendants on Western's commercial misrepresentation claim.

## V. Unfair Competition.

■ Western also has brought a state law claim of unfair competition against defendants. Western argues that defendants' actions constitute unfair competition primarily because Superior has dressed and marketed its goods "in such a way as to cause confusion between [its] goods or business and that of a prior trader." *Manor of Burlingame, Inc. v. SHCC, Inc.,* 22 Kan.App.2d 437, 916 P.2d 733 (1996) (quoting *American Fence Co. of the*

*Midwest, Inc. v. Gestes,* 190 Kan. 393, 375 P.2d 775 (1962)). For substantially the same reasons as those stated above on Western's other claims, the court concludes that defendants' actions do not constitute unfair competition. In particular, the court finds that Western has not established (1) consumers are likely to be confused by the trade dress of Superior's products or (2) Superior unfairly benefitted or cashed in on Western's goodwill. In addition, the court notes that the two Kansas cases plaintiff cited which found unfair competition are not analogous here because defendants clearly labeled, packaged, invoiced, and advertised its pumps as their own, not Western's. *Cf. Manor of Burlingame,* 22 Kan.App.2d 437, 916 P.2d 733 (1996) (marks at issue were "Santa Fe Trail Nursing Center" and "Santa Fe Trail Health Care of Topeka"); *American Fence,* 190 Kan. 393, 375 P.2d 775 (1962) ("American Fence Company of the Midwest, Inc." and "All–American Fence Company"). For the above reasons, the court concludes that judgment in favor of defendants on Western's unfair competition claim is appropriate.[1]

### *Superior's Motion For Attorneys' Fees*

■ Western also filed a claim for copyright infringement based primarily on Superior's alleged copying of Western's parts price lists. On August 22, 1997, Western moved to dismiss the copyright claim with prejudice. On August 27, 1997, the first day of trial, the court dismissed Western's copyright claim with prejudice but granted Superior leave to apply for attorneys' fees for the defense of the copyright claim. Superior now has filed such a motion.

Superior argues that Western applied for a copyright for its parts list to bolster its trade dress infringement claim and that Western affirmatively misrepresented facts to the copyright examiner to obtain a copyright certificate. In particular, Superior claims that Western failed to inform the copyright examiner that Western's current parts price list was a derivative work based on pre-existing parts lists Western had published prior to

---

1. Western also brought a claim of "misappropriation" against Superior. Western has not provided any legal authority or factual support for

such a claim in this case and the court independently has not found any support for such a claim.

1989. Superior argues that assessing attorneys' fees is proper because Western brought its copyright claim in bad faith and dismissed its claim at trial to prevent Superior from becoming a prevailing party under 17 U.S.C. § 505. Western responds by arguing that Superior is barred from raising Western's alleged misrepresentations or bad faith for failure to raise the issues prior to trial. Western does not respond to Superior's substantive allegations of misrepresentations or bad faith.

After carefully reviewing the evidence presented by Superior, the court concludes that Superior has failed to establish that it would have indeed prevailed at trial on Western's copyright infringement claim. In particular, Superior likely would have been barred from presenting evidence of Western's misrepresentations for failure to raise the issue in the pretrial order or prior to Western's motion to withdraw the claim. There is insufficient evidence for the court to conclude that Western pursued its copyright infringement claim in bad faith.

IT IS THEREFORE ORDERED that defendants' motion to assess attorneys' fees (Doc. # 53) is denied.

IT IS FURTHER ORDERED that the clerk is directed to enter judgment in favor of defendants Superior Manufacturing, Inc. and Alan H. Hulva on all counts of plaintiff's amended complaint.