BUCA, INC., a Minnesota Corporation,
Plaintiff,

v.

GAMBUCCI'S, INC., a Kansas Corporation; Tippin's Restaurants, Inc., a Kansas Corporation; James Kerwin; and Gary Guzzo, Defendants.

Civil Action No. 98–2040–EEO.

United States District Court,
D. Kansas.

Aug. 3, 1998.

Karen Z. Schutter, Swanson, Midgley, Gangwere, Kitchin & McLarney, LLC, Kimberly A. Jones, Blackwell Sanders Peper

Martin LLP, Kansas City, MO, Calvin L. Litsey, William L. Underwood, Felicia J. Boyd, Karen E. Wilson, James R. Steffen, Jerry W. Snider, Faegre & Benson, LLP, Minneapolis, MN, for Plaintiff.

Leonard B. Rose, Lewis, Rice & Fingersh, L.C., Kansas City, MO, Defendants

## MEMORANDUM AND ORDER

EARL E. O'CONNOR, District Judge.

This matter is before the court on plaintiff's application for preliminary injunction (Doc. # 34). Plaintiff Buca, Inc., filed this action against defendants Gambucci's, Inc., Tippin's, Inc., James Kerwin and Gary Guzzo, claiming: federal unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a); federal dilution in violation of § 43(c) of the Lanham Act, 15 U.S.C. § 1125(c); violation of the Kansas Consumer Protection Act, K.S.A. § 50–626 et seq.; and unfair competition at common law. Plaintiff seeks to enjoin defendants from operating any restaurant featuring any combination of certain enumerated decor elements of plaintiff's claimed trade dress.

On June 8 and 9, 1998, this case came on for hearing before the court on plaintiff's motion for preliminary injunction. Thereafter, the parties submitted proposed findings of fact and conclusions of law. On July 15, 1998, the court entertained closing arguments on the motion. After carefully considering the arguments of counsel, the testimony of the witnesses, the exhibits, and the briefing submitted by the parties, the court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

### Findings Of Fact

1. Plaintiff Buca, Inc. ("Buca") is a Minnesota corporation with its principal place of business in Minneapolis, Minnesota.

2. Defendant Gambucci's, Inc. ("Gambucci's") is a Kansas corporation with its principal place of business in overland Park, Kansas.

3. Defendant Tippin's Restaurants, Inc. ("Tippin's") is an Iowa corporation with its principal place of business in Overland Park, Kansas.

4. Defendant James Kerwin resides in Kansas, and is president and chief executive officer of Tippin's and Gambucci's.

5. Defendant Gary Guzzo resides in Kansas, and is vice-president of Tippin's and Gambucci's.

6. Buca has filed suit against defendants, alleging federal unfair competition in violation of § 43(a) of the Lanham Act; federal trade dress dilution in violation of § 43(c) of the Lanham Act; violation of the Kansas Consumer Protection Act, K.S.A. § 50–626 et seq.; and unfair competition under Kansas common law.

7. Philip Roberts is the creator and chairman of Buca restaurants. Roberts opened the first Buca restaurant in Minneapolis, Minnesota, in May 1993. The word "buca," in Italian, means "cellar" or "basement."

8. Buca currently owns and operates thirteen Italian restaurants in six states. The various states and their respective cities in which the Buca restaurants are located are: Minnesota (Minneapolis, Eden Prairie, and St. Paul); Wisconsin (Milwaukee); Illinois (Chicago, Wheeling); Indiana (Indianapolis); Washington (Lynnwood, Seattle); and California (Palo Alto, Pasadena, Encino, and San Francisco).

9. Buca has signed a commercial lease for a restaurant in Lenexa, Kansas. Buca says it has plans to open one of its restaurants at the Lenexa location in the fall of 1998.

10. Roberts describes the decor of the Buca restaurants as "kitschy," "campy," "tschochy," and "Italian gaudy." He states that the use of Italian decor elements in an excessive, humorous, irreverent way, so as to create a parody of a 1940's/1950's Southern Italian immigrant restaurant, characterizes Buca restaurants and defines the Buca trade dress.

11. Buca employs excess in its restaurant decor by the excessive use of objects such as photographs, statuary, year-round Christmas tree lights, Italian mass-produced souvenirs, bowling pins, trophies, and soccer pennants.

12. Roberts, in identifying what he perceives as Buca's trade dress, testified as follows:

> Buca is an immigrant Southern Italian restaurant with all of the excess Italian gaudy. As we have heard earlier, kitschiness, campiness, high kitsch, high camp. A whole lot of everything and in excessive amounts. And the excess goes over into— it's not just the food. It is in the decor and the hundreds and hundreds and hundreds of pictures and art objects and decorative devices we hang on the wall. It's the number of pieces of statuary that we use. It's the intentional use of velour drapes to generate sort of a homey bohemian sort of a quality to the restaurant. It's purposely mismatching light fixtures. It's Christmas tree lights up all year-round. It's statuary on the exterior. It's 1940's and 1950's expression of an immigrant Southern Italian restaurant.

Transcript of Preliminary Injunction Hearing, at 215.

13. To carry out Buca's irreverent, "over the top" theme, Roberts explained that Buca uses items and decorations that would normally be found in an Italian restaurant, but presents them in a non-traditional manner. As examples, Roberts stated that Buca restaurants display: Italian statuary in a marbleized lime green or pink paint, draped with Christmas tree lights; a photograph of Frank Sinatra covered with purple velvet and gold-fringed draping that still has a price tag on it; and a ceiling with Renaissance cherubs holding cooking spoons.

14. Roberts testified that Buca restaurants are not intended to look like an actual 1940's or 1950's Southern Italian immigrant restaurant. According to Roberts, Buca's decor is intended to cause a customer to imagine what a 1940's or 1950's immigrant Southern Italian restaurant might feel like.

15. Buca has received unsolicited media coverage by the restaurant industry. The restaurant has been featured at least three times in Nation's Restaurant News, a leading trade publication. Buca has also received unsolicited media coverage through restaurant reviews, including the Minneapolis Star Tribune, Milwaukee Journal Tribune, Seattle Post–Intelligencer, San Francisco Chronicle, and the Chicago Tribune. In 1994, Bon Appetit magazine recognized Buca as a "Best New Restaurant."

16. In 1979, defendants James Kerwin and Gary Guzzo created a pie restaurant called Pippin's Restaurant. Three years later, the name was changed to Tippin's Restaurant. Tippin's has operated continuously since the early 1980's, and offers a broad menu with emphasis on pies, cheesecakes, and other desserts.

17. In 1995, defendants Kerwin and Guzzo discussed the creation of a new restaurant, different in style and appearance from the Tippin's restaurants. The restaurant concept that they decided upon was a 1940's/ 1950's Southern Italian style restaurant.

18. In December 1995, defendants hired Ralph Lemle to aid in the execution of the new restaurant concept. Lemle is the Director of New Concepts for Tippin's and Gambucci's.

19. Lemle made five visits to various Buca restaurants between December 1995 and February 1996. The purpose of the trips was to research and develop ideas for a Southern Italian style restaurant. As part of research and development for the new restaurant, Lemle also made visits to at least twenty-six other Italian restaurants throughout the country. Lemle testified that he visited the restaurant Maggiano's in Chicago as many times as he visited Buca restaurants.

20. Guzzo made seven visits to Buca restaurants between December 1995 and October 1996 for research and development of the Italian restaurant concept. Kerwin made four visits to Buca restaurants between December 1995 and October 1996 for research and development purposes.

21. Guzzo and Kerwin visited 106 different Italian restaurants throughout the United States before opening Gambucci's. Kerwin and Guzzo visited one Maggiano's in Chicago more times than they visited the various Buca restaurants.

22. Roberts testified that he conducted extensive research and development before

opening the first Buca restaurant by visiting "more than one hundred" Italian restaurants throughout the United States and Italy. He also testified that he took photographs of Italian restaurants on these "R and D" trips.

23. Richard Good, plaintiff's trade dress expert, testified that it is a common practice in the restaurant industry to conduct research and development excursions to numerous restaurants for the purpose of gathering ideas for a new restaurant concept.

24. In December of 1995, defendants hired William Yarger of Yarger and Associates, Inc. ("Yarger") as the architect for the Gambucci's project. Yarger was also hired to develop the thematic approach, based on Kerwin's and Guzzo's idea for a 1940's–1950's Southern Italian restaurant. Yarger in turn hired Kim Wilson as his thematic consultant. Defendants paid a total of $100,000 to Yarger and Associates, Inc., for their services on the Gambucci's project. Of that sum, $40,000 was the fee for the development of the thematic approach.

25. Yarger testified by deposition. During the deposition, he was asked what kind of direction he received from the people at Tippin's as to how they wanted the restaurant to look. Yarger responded, "I don't recall getting any specific direction. I think they counted on us using our imagination in coming up with something that we were comfortable with."

26. Yarger noted in his deposition that the design team was influenced by the play "Tony and Tina's Wedding," as a "kind of fun, free-fall kind of experience, and other things that were happening in the early part of 1996." He testified that the idea for putting numerous pictures on the walls came from looking at a variety of pictures from theme parks in Florida, and bars that the design team visited. Yarger also testified that the pulpit-like hostess stand chosen for Gambucci's was a hostess stand from a previous Tippin's restaurant. Yarger further testified that he did not "knock off," or copy, Buca restaurants.

27. Kim Wilson, the thematic consultant hired for the project, testified that no one ever told her to create a design for Gambuc-

ci's that looked like Buca. She stated that she has never visited a Buca restaurant. Wilson testified that in developing ideas for the look of Gambucci's:

> We went to the Hill area and Italian area in St. Louis and took pictures of building exteriors. I went to the Bowling Hall of Fame. We went to a small bowling hall in Maple Wood. Went to another restaurant ... near St. Louis University call the Underground. Visited a bocci court/restaurant on the Hill. Also, Italian markets on the Hill.

*Id.* at 449.

28. Wilson estimated that she looked at "thousands" of pictures to come up with ideas for the Gambucci's project. Of that number, she testified she reviewed approximately seventy-two photos of Buca restaurants. She further testified that no one told her to give special emphasis to the Buca photos.

29. Wilson stated that she looked at "stacks and stacks" of books for ideas, including "1950's research to gas station, bowling, restaurant books, Italian recipe books, period style collector's books." *Id.* at 450.

30. Wilson also testified that "a very heavy influence" in the design of Gambucci's was derived from photographs of her design assistant's immigrant Italian family. Wilson stated that "we took one photograph in particular of that [group] and pulled pieces off of it for primary sources for the prop book and for the basic look of one of the rooms and the actual story line."

31. Wilson stated that to develop the theme of the restaurant, the design team came up with a "story line" with several different scenarios involving the 1940's and 1950's. The team put together design boards that reflected each of the different story lines, presented them to the Tippin's people, and then gleaned information from them regarding things they liked and didn't like. Wilson testified that, prior to her involvement in this litigation, the design boards were destroyed in the process of cleaning out her files.

32. According to Wilson, at the time that she and Yarger developed the three different

concepts, no one connected with Tippin's or Gambucci's had told her how they wanted the new restaurant to look. The most specific instruction she received from defendants was that they wanted the restaurant to be "theatrical, fun, family oriented, and exciting to look at. Have lots of props and visual elements for people to entertain themselves with while they eat or wait." *Id.* at 452–53.

33. The phrase Wilson developed to define the concept for Gambucci's was "to create a comfortable, kitschy, garage sale chic, little Italian restaurant on the corner." Wilson testified that this idea was her proposal, and she did not work with the Tippin's people to develop the concept.

34. Gambucci's restaurant presents a theme premised on the idea that an Italian family, the Gambucci's, converted their house into a restaurant. There are numerous rooms throughout the restaurant, each reminiscent of a particular room in a home, with each room decorated with elements characteristic of that type of room.

35. At the hearing, Guzzo testified that:
Basically, what we put around the restaurant is the theme of the room. If we're in our informal den room, we'll decorate that room with informal objects. If we're in our formal room, we'll decorate it with more fine china and stuff like that. We may decorate with Campo di Monte fixtures from Italy that are very expensive.
*Id.* at 173.

36. Wilson stated that of the design elements adopted for the restaurant, either she or the design team as a whole specifically suggested: the neon signage; the words "Air Conditioned;" the color wash on the walls; the statuary; different rooms with different curtains matching each room; and the bowling pins.

37. On one part of the Gambucci's project, the design team spent over 300 hours. Wilson stated that she stopped keeping track of the hours spent on another section of the project.

38. Buca's expert on trade dress, Richard T. Good, owns and operates a management consulting firm specializing in the restaurant industry. Good classified both Buca and Gambucci's as restaurants within the "Italian casual dining" segment of the restaurant industry. Good testified that, in his opinion, Buca restaurants had a trade dress that was distinctive and unique, specifically, the "unusual, humorous, parody, over the top, irreverent, combination of all of those ingredients." *Id.* at 365. Good also opined that Buca restaurants had acquired secondary meaning, based on the following factors: the fact that Buca's brand and its trade dress has been in operation since 1993; the amount of coverage or "buzz" that the Buca brand had achieved within the industry over the last several years (in the form of restaurant reviews and recognition in trade journals); and the sales success that Buca had enjoyed. Good further stated that in his opinion, Gambucci's copied the trade dress of Buca, because "it's just simply hard for me to believe, in my experience, that all of these similarities could have come about on a strictly coincidental basis," and because "I've heard testimony that people involved with the design process [of Gambucci's] were obviously aware of Buca at the time they were putting their trade dress together." *Id.* at 381–82.

39. Defendants' trade dress expert, Christopher C. Muller, received a doctorate from Cornell University's School of Hotel Administration. For the past six years, Muller has been a faculty member at Cornell University, and teaches undergraduate and graduate courses on chain restaurant management. For the past two years, Muller has taught a course on legal issues in the chain restaurant business, including legal issues involving trade dress. In his opinion, both Buca and Gambucci's are generic nostalgic Italian restaurants, and neither has a trade dress. He testified by deposition that, in his opinion, Buca restaurants have no secondary meaning "because Buca doesn't mean anything to anybody that I know." Transcript of Muller's deposition at 66.

40. In October 1996, defendants opened a restaurant with a 1940's/1950's Southern Italian theme in Wichita, Kansas, called Gambucci's. Defendants opened a similar Gambucci's in Olathe, Kansas, on June 22, 1998.

41. Gambucci's is conspicuously labeled by a sign across the front of its two buildings, and on its menus and other places inside the restaurants. The name Gambucci's is not in itself confusingly similar to the name Buca or Buca di Beppo's.

42. Roberts testified that Buca did not learn about the existence of Gambucci's until December 1997. Upon being informed about Gambucci's, Buca sent an individual to visit the Wichita Gambucci's and assess whether it had copied Buca's trade dress. By early January, the individual reported back to Roberts that there was a look-alike restaurant in Wichita. Buca initiated this lawsuit on January 21, 1998.

43. By this action, Buca seeks to preliminarily enjoin the defendants from the following:

"Opening or operating any restaurant, bar, or other dining establishment that features any combination of the following elements of Buca's trade dress which results in a confusingly similar trade dress or a trade dress that dilutes the distinctive character of Buca's trade dress:

1. A restaurant exterior displaying a striking neon sign and including a filled glass depicted in neon;

2. Other than between Thanksgiving and New Year's, restaurants' exteriors and interiors with Christmas lights all year round, including outdoor and indoor Romanesque statues also draped in Christmas lights;

3. The advertisement of 'air-conditioned' in neon on the exterior of the restaurant;

4. A formal dining area that contains a very large table with a special name;

5. The display of photos throughout interior walls depicting in a manner that is humorous, gaudy or a parody both real and stereotyped Italian–American life and cultural icons, such as Frank Sinatra;

6. Displaying more than 100 photos per store;

7. Painted ceilings with images from traditional renaissance religious paintings depicted in a manner that is humorous, gaudy or a parody;

8. Painted walls with fruits and vegetables;

9. Walls painted with red or gold wash;

10. A pulpit host/hostess podium;

11. Use of a style of table service where the dishes are stacked on a table similar to that used by Buca;

12. A restaurant with a 'kitchen' table for patrons which gives patrons the unique experience of dining in a restaurant kitchen;

13. The display of round focaccia bread openly on shelves;

14. The display of unmatched antique fixtures;

15. The display of faux reproductions of famous Greco–Roman artwork with irreverent modifications;

16. The use of unmatched curtains;

17. The display of humorous and irreverent sayings on the walls;

18. The display of bowling pins and Italian/European soccer pennants;

19. The use of shadow boxes on walls;

20. The use of gaudy, campy, or humorous collectibles and objects;

21. The use of padded doors (interior or exterior);

22. The use of gilded frames and accented shelving."

Plaintiff's Proposed Preliminary Injunction Order at 1–3.

44. Plaintiff clarified during closing arguments that it is only proceeding under § 43(a) of the Lanham Act in its request for a preliminary injunction.

### Conclusions of Law

A preliminary injunction is an extraordinary remedy which is granted as the exception rather than the rule. *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir.1984). The main purpose of a preliminary injunction is to preserve the status quo pending a trial on the merits in order for the trial court to render a meaningful decision. *Resolution*

*Trust Corp. v. Cruce*, 972 F.2d 1195, 1198 (10th Cir.1992).

■ To obtain a preliminary injunction, the movant must demonstrate that: (1) it will suffer irreparable injury in the absence of an injunction; (2) this injury outweighs whatever damage the injunction may cause the opponent; (3) the injunction is consistent with the public interest; and (4) there is a substantial likelihood it will eventually prevail on the merits. *Chemical Weapons Working Group v. U.S. Dept. of the Army*, 111 F.3d 1485, 1489 (10th Cir.1997); *City of Chanute v. Kansas Gas & Elec.*, 754 F.2d 310, 313 (10th Cir.1985); *Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir.1980).

■ A preliminary injunction is disfavored if it: (1) disturbs the status quo; (2) is mandatory as opposed to prohibitory; or (3) affords the movant substantially all the relief he may recover following trial on the merits. *SCFC ILC, Inc. v. Visa USA*, 936 F.2d 1096, 1098–99 (10th Cir.1991). Motions for preliminary injunction when the requested relief falls within one or more of these three categories are subjected to a higher standard. To prevail on such a motion, "the movant must show that on balance, the four factors weigh heavily and compellingly in his favor." *Id.* at 1099. *See also Paul's Beauty College v. United States*, 885 F.Supp. 1468, 1471 (D.Kan.1995). Mandatory injunctions will not be granted in doubtful cases where the facts and law do not clearly favor the movant. *American Carriers v. Baytree Investors*, 685 F.Supp. 800, 806 (D.Kan.1988).

The relief sought by Buca falls within all three of the disfavored categories. In the instant case, plaintiff seeks a mandatory injunction, which would disturb the status quo by requiring the defendants to remove twenty-two decor elements in its existing restaurants in Wichita and Olathe. The preliminary injunction relief, if granted, would also afford Buca substantially all the relief it may recover following trial on the merits. Thus, Buca is required to demonstrate that the factors supporting injunctive relief "weigh heavily and compellingly in the movant's favor."

The movant has the burden to establish by clear and unequivocal proof its right to a preliminary injunction. *Penn v. San Juan Hospital*, 528 F.2d 1181, 1185 (10th Cir.1975); *Wilson v. Bruce*, 816 F.Supp. 679 (D.Kan. 1993). Mere allegations are not sufficient. *Kansas City, Kan. Frat. Order of Police v. City of Kansas City*, 620 F.Supp. 752, 768 (D.Kan.1984). The grant or denial of a preliminary injunction rests within the sound discretion of the trial court. *Tri–State Generation and Transmission v. Shoshone River Power*, 805 F.2d 351, 354 (10th Cir.1986); *Amoco Oil Co. v. Rainbow Snow*, 748 F.2d 556, 557 (10th Cir.1984).

The Tenth Circuit has adopted a modified interpretation of the "likelihood of success" requirement. If the first three requirements for a preliminary injunction are satisfied, then the movant can establish the fourth requirement, likelihood of success, by merely showing questions going to the merits so serious, substantial, difficult and doubtful, as to make the issues fair ground for litigation and deserving of more deliberate investigation. *City of Chanute v. Kansas Gas and Electric Co.*, 754 F.2d 310 (10th Cir.1985); *Otero Sav. & Loan Ass'n v. Federal Reserve Bank*, 665 F.2d 275 (10th Cir.1981).

For the reasons stated below, the court concludes that plaintiff has not met its burden and has not established its right to preliminary injunctive relief. Because we conclude that plaintiff has failed to establish that there is a substantial likelihood that it will succeed on the merits even under this circuit's modified interpretation, *City of Chanute, supra*, the first three requirements necessary to warrant preliminary injunctive relief need not be addressed. To the extent we would consider the first three requirements, however, we would conclude that Buca has failed to meet its burden as to these requirements as well.

**I.** *Likelihood of Success on the Merits— Unfair Competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).*

■ Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), creates a federal cause of action for trade dress infringement. Section 43(a) provides:

Any person who shall affix, apply, or annex, or use in connection with any goods or services or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce ... shall be liable to a civil action ... by any person who believes that he is or is likely to be damaged by use of any such false description or representation.

"Trade dress features are those comprising a product's look or image." *See Winning Ways, Inc. v. Holloway Sportswear, Inc.*, 913 F.Supp. 1454 (D.Kan.1996) (citing *Vornado Air Circulation Systems, Inc. v. Duracraft Corp.*, 58 F.3d 1498, 1502 (10th Cir.1995), *cert. denied*, 516 U.S. 1067, 116 S.Ct. 753, 133 L.Ed.2d 700 (1996)). In determining the protectability of a trade dress, it is improper for the court to focus on individual features in isolation, but rather must consider the whole features, taken together. *Id.* at 1462.

In the instant action, Buca claims that the combination of decor elements in its Italian restaurants creates an overall appearance and total image that is kitschy, campy, gaudy, excessive, irreverent, humorous, and a parody of a 1940's/1950's immigrant Southern Italian restaurant, and that such combination of features constitutes protectable trade dress. Buca does not contend that the specific features themselves are unique or constitute its trade dress, but that it is the combination of these elements that creates Buca's trade dress.

To establish infringement of its trade dress, Buca must prove that (1) the design of its restaurants is inherently distinctive or distinctive by virtue of having acquired secondary meaning and (2) there is a likelihood of confusion between Buca's and Gambucci's restaurants. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992); *Vornado*, 58 F.3d at 1502–03; *Hartford House Ltd. v. Hallmark Cards, Inc.*, 846 F.2d 1268, 1271 (10th Cir.), *cert. denied*, 488 U.S. 908, 109

S.Ct. 260, 102 L.Ed.2d 248 (1988). Gambucci's may defend by showing that Buca's alleged trade dress is functional and, therefore, may be freely copied. *See Brunswick Corp. v. Spirit Reel Co.*, 832 F.2d 513, 517, 520 (10th Cir.1987). The burden of proof of functionality is on the defendant. *Hartford House*, 846 F.2d at 1271 n. 3; *Brunswick*, 832 F.2d at 520 ("The trial court correctly imposed the burden of proof of functionality on defendant.").[1]

### A. Distinctiveness Of Buca Restaurants.

#### 1. *Inherently Distinctive.*

In evaluating the distinctiveness of trademarks, the Tenth Circuit has adopted the traditional categorical (or *Abercrombie* ) approach where the trademark is determined to be either (1) generic, (2) descriptive, (3) suggestive, or (4) fanciful or arbitrary. *See Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 939 & n. 5 (10th Cir.1983) (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9–10 (2d Cir.1976)). This test is equally applicable to trade dress under § 43(a), because "§ 43(a) provides no basis for distinguishing between trademark and trade dress." *Stuart Hall Co. Inc. v. Ampad Corp.*, 51 F.3d 780, 785 (8th Cir.1995) (quoting *Two Pesos*, 505 U.S. at 773, 112 S.Ct. 2753). *See also Western Chemical Pumps, Inc. v. Superior Mfg.*, 989 F.Supp. 1112, 1119 (D.Kan.1997); *Winning Ways, Inc.*, 913 F.Supp. at 1463 (applying Abercrombie test to trade dress infringement cases).

A trademark (or trade dress) classified as fanciful, arbitrary, or suggestive is deemed inherently distinctive and is entitled to protection. *Two Pesos*, 505 U.S. at 768, 112 S.Ct. 2753. No proof is required that such trademark has acquired secondary meaning. *See Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 162–63, 115 S.Ct. 1300, 131 L.Ed.2d 248 (citing *Abercrombie*, 537 F.2d at 9–10). On the other hand, a trademark or trade dress that is descriptive or generic is not considered inherently distinctive. *See id.* A descriptive mark may acquire the distinctiveness which will allow it

---

**1.** Because we conclude, *infra*, that plaintiff has not met its burden of proving protectable trade dress, we need not consider the defendants' affirmative defense of functionality.

to be protected under the Lanham Act. *Two Pesos,* 505 U.S. at 769, 112 S.Ct. 2753. This acquired distinctiveness is generally called "secondary meaning." *Id.* A mark classified as generic is entitled to no legal protection. *Beer Nuts,* 711 F.2d at 939.

The Tenth Circuit has defined each of these terms. A fanciful or arbitrary trademark "bear[s] no relationship to the product or service with which [it is] associated." *Beer Nuts,* 711 F.2d at 939. A suggestive trademark requires "imagination, thought and perception to reach a conclusion as to the nature of goods." *Id.* (citing *Abercrombie,* 537 F.2d at 11). A descriptive trademark "conveys an immediate idea of the ingredients, qualities or characteristics of the goods." *Id.* at 939 n. 5 (citing *Abercrombie,* 537 F.2d at 11). Generic refers to "a particular genus or class of which an individual article or service is but a member." *Id.* at 939.

■ Buca maintains that its trade dress is "suggestive," because "it requires the use of customer thought or imagination as to the nature of the specific restaurant services Buca offers." Plaintiff's Proposed Findings and Conclusions at 25. Thus, Buca contends, its trade dress is inherently distinctive. Gambucci's argues that Buca's trade dress is generic.

The court has reviewed the numerous photographs and the two videotapes of Buca restaurants, and finds that Buca's specific combination and excessive use of its design features is not inherently distinctive. We note initially that a product or package feature is not inherently distinctive merely because there is no other product on the market that looks exactly the same. See 1 *McCarthy on Trademarks* § 8.13 at 8–35 (4th ed.1996). As Judge Rovner observed:

> Presumably, it could be said about the trade dress of any new product that no competitive product combines precisely the same elements in its trade dress.... However, that fact alone does not make the product's trade dress inherently distinc-

tive. Any other rule essentially would require a finding of inherent distinctiveness whenever a new product enters the market.

*Turtle Wax, Inc. v. First Brands Corp.,* 781 F.Supp. 1314, 1321 (N.D.Ill.1991). Accordingly, we find plaintiff's evidence that no other restaurant has the precise combination of features arranged in the same excessive, irreverent manner as Buca simply does not militate a finding of inherent distinctiveness.

Plaintiff also argues that evidence of copying can support a conclusion of inherent distinctiveness. However, as we discuss *infra,* plaintiff has submitted no substantial, credible evidence of intentional copying on the part of defendants; plaintiff's evidence on this point is conjectural at most. We find such evidence insufficient to support a finding of inherent distinctiveness.

■ After reviewing all of the evidence, we conclude that Buca's trade dress is best classified as "descriptive." The trade dress created by the overall look of a Buca restaurant, when viewed as a whole, does nothing more than convey to an ordinary consumer an immediate idea of the ingredients, qualities or characteristics of the goods. The trade dress is not suggestive because no imagination, thought or perception is necessary to reach a conclusion as to the nature of the goods. Indeed, the overall look of the restaurant bears a fundamental relationship to the nature of the product, Southern Italian food. For the above reasons, the court finds that Buca has not established that its restaurant trade dress is inherently distinctive.[2] Consequently, we must consider whether plaintiff's restaurant features have acquired inherent distinctiveness through secondary meaning.

### 2. *Distinctive By Secondary Meaning.*

■ "To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature ... is to identify the source

---

**2.** We observe, however, that even were we to conclude that plaintiff had met its burden of establishing that its trade dress was inherently distinctive, plaintiff still would be unable to dem-

onstrate a likelihood of success on the merits because of our finding, *infra,* that plaintiff has failed to prove any likelihood of confusion.

of the product rather than the product itself." *Inwood Labs., Inc. v. Ives Labs., Inc.,* 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982). To prove secondary meaning in alleged trade dress, plaintiff need not prove that consumers know the name of the plaintiff company: "the showing required is that consumers associate the trade dress with a single source," even if the name of that source is unknown. 1 *McCarthy on Trademarks,* § 8:8 at 8–23 (citing *Stuart Hall Co. v. Ampad Corp.,* 51 F.3d 780 (8th Cir.1995)).

■ The courts consider a variety of factors to determine whether a product has acquired secondary meaning, including: (1) consumer testimony or surveys linking the trade dress to a single source, (2) advertising, (3) unsolicited media coverage of the product, (4) exclusivity and length of use, (5) sales success, and (6) intentional copying of the trade dress. *See Western Chemical Pumps,* 989 F.Supp. at 1120–21 (citing cases). No one factor is dispositive and a plaintiff does not have to present evidence with respect to each factor. *Id.* at 1121 (citing *Centaur Communications, Ltd. v. A/S/M Communications, Inc.,* 830 F.2d 1217, 1222 (2d Cir.1987)). The above factors are designed to focus the court's attention on the consuming public's perception of the product. *Id.*

■ Plaintiff asserts that "[a] particularized showing of secondary meaning in the targeted market is not required if a trade dress is inherently distinctive." Plaintiff's Proposed Findings and Conclusions at 27. However, in a situation where, as here, a movant's trade dress is determined *not* to be inherently distinctive, the movant is required to prove secondary meaning, and as noted by plaintiff, must prove secondary meaning *in the targeted market. See, e.g., T.G.I. Friday's, Inc. v. International Restaurant Group, Inc.,* 405 F.Supp. 698, 709 (M.D.La. 1975) ("The Court concludes that plaintiff has failed to prove that the consuming public *in this area* associates its 'trade dress' exclusively with its restaurants and with no one else's.... Despite plaintiff's fairly extensive advertising and favorable national press, we are convinced that its restaurants' motif is no

more well known in this area than is, for example, Hoolihan's restaurant in New Orleans.") *judgment aff'd,* 569 F.2d 895 (5th Cir.1978).

The evidence plaintiff has submitted on the issue of secondary meaning focuses on the factors as applied to Buca's current market. The court observes, however, that plaintiff has not shown that establishing secondary meaning in its current market is sufficient to establish secondary meaning in the Kansas City and Wichita area markets.

■ The court will now address in turn each of the factors for assessing secondary meaning.

#### (a) *Consumer Testimony.*

Buca failed to submit any consumer surveys or direct consumer testimony. Consumer surveys and testimony is generally the most persuasive and desirable evidence of secondary meaning. *See Bonny Prods., Inc. v. Robinson Knife Mfg. Co.,* 14 U.S.P.Q.2d 1666, 1667, 1989 WL 34045 (S.D.N.Y.1989). However, because of the expedited nature of injunction proceedings, the lack of consumer testimony and surveys is not dispositive to plaintiff's claim. Nevertheless, the court notes the absence of this factor, and finds the lack of any evidence regarding this factor weighs to some degree against a finding of secondary meaning.

#### (b) *Advertising.*

"The amount, scope, nature and duration of advertising aid a court's determination of whether or not trade dress has achieved secondary meaning." *Winning Ways,* 913 F.Supp. at 1470. The critical question in considering the evidence, however, "is not the extent of the promotional efforts but their effectiveness in creating an association" in the mind of the consumer between the trade dress and the plaintiff. *Id.* (citing *Brooks Shoe Mfg. Co., Inc. v. Suave Shoe Corp.,* 533 F.Supp. 75, 78 (S.D.Fl.1981)). The court should pay primary regard to "those advertisements which highlight the supposedly distinctive, identifying feature." *Duraco Prods. Inc. v. Joy Plastic Enterprises, Ltd.,* 40 F.3d 1431, 1452 (3d Cir.1994). "[T]he advertising and promotional activities

must involve 'image advertising,' that is, the ads must feature in some way the trade dress itself." *First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378, 1383 (9th Cir. 1987) (quoting *Brooks Shoe Mfg. Co. v. Suave Shoe Corp.*, 716 F.2d 854, 860 (11th Cir. 1983)).

As to the nature of the advertising, plaintiff has submitted Exhibit 14, which consists of photocopies of six print advertisements used by various Buca restaurants. The court finds that the first advertisement, displaying draped red velvet-like curtains, with what appear to be vines and tassels intertwined around the curtains, and cherubs sitting atop the curtains, highlights some of Buca's "supposedly identifying features." *Duraco*, 40 F.3d at 1452. The court, however, finds that the remaining advertisements, which contain humorous caricatures and photos of people, fail to feature elements of Buca's trade dress,[3] and therefore fail to effectively create an association in the mind of the consumer between the trade dress and its source.[4]

Plaintiff has produced no specific evidence as to the amount, scope and duration of its advertising. Plaintiff has presented no evidence of any advertising disseminated in the target market (the Kansas City and Wichita areas), or any advertising in the states adjacent to Kansas (Missouri, Iowa, Nebraska, Oklahoma, or Colorado). We find that Buca has failed to show that the scope of its advertising established any association between itself and its trade dress in the minds of consumers in the relevant, target market.

(c) *Unsolicited Media Coverage.*

Plaintiff presented evidence that Buca received unsolicited media coverage in newspapers, in the form of favorable restaurant reviews emphasizing plaintiff's trade dress, and in trade journals, such as Nations Restaurant News. The court finds that the restaurant reviews do not support a finding of secondary meaning in the target market, because all of the reviews were published in newspapers outside of the Kansas City and Wichita areas (the Minneapolis Star Tribune, Milwaukee Journal Tribune, Seattle Post–Intelligencer, San Francisco Chronicle, and the Chicago Tribune). Plaintiff has presented no evidence that such media coverage has created an association between plaintiff's trade dress and the source of its product in the minds of consumers in the relevant target market.

With respect to plaintiff's evidence of media coverage in trade journals, the court finds such evidence irrelevant in proving secondary meaning. Plaintiff's own expert testified that trade journal articles are circulated only to the trade, and are not ordinarily read by the general public. Transcript at 435. Plaintiff presented no evidence that the trade journal articles were read by the general public. Thus, trade journal coverage does not support the showing required to establish secondary meaning, to wit, that *consumers* associate the trade dress with a single source. *See Aromatique, Inc. v. Gold Seal*, 28 F.3d 863, 872 (8th Cir.1994) ("[I]n order to be the basis for an inference of secondary meaning, the articles must in some way indicate a connection in the minds of consumers between the trade dress and Aromatique. Some of the articles seem to have been published in trade journals or the business press. Such articles are not likely to be read by ordinary consumers and do not necessarily reflect the minds of consumers with respect to the necessary connection between Aromatique and its claimed marks.")

(d) *Exclusivity And Length Of Use.*

No fixed length of time must pass before trade dress can achieve secondary meaning. *Winning Ways*, 913 F.Supp. at 1471 (citing J. Thomas McCarthy at § 15.20[2] ). Plaintiff contends that Buca has consistently[5] and

---

3. The mere fact that the advertisements are somewhat humorous or "irreverent" is not sufficient, in our view, to amount to "featuring the trade dress itself." *First Brands Corp.*, 809 F.2d at 1383.

4. Though Roberts testified that Buca frequently issues a press release package, compiled by plaintiff's marketing people, when a Buca restaurant is about to open, the court is unable to evaluate the nature of this advertising, as it was not submitted as an exhibit.

5. Defendants argue that the exteriors of the Buca restaurants are not consistent, and that such inconsistency militates against a finding of any trade dress. We need not specifically resolve this particular issue, because even assuming that

exclusively used its trade dress in its restaurants since 1993. Plaintiff also notes that, pursuant to 15 U.S.C. § 1052(f), a statutory presumption arises that five years of continuous and exclusive use of a mark is prima facie evidence of secondary meaning.

The court finds that, while plaintiff's evidence on this factor may support a finding of secondary meaning in its current marketplace, the evidence of continuous and exclusive use in other, fairly remote markets carries little weight in establishing secondary meaning in the target market. *See The Warehouse Restaurant, Inc. v. The Customs House Restaurant, Inc.*, 217 U.S.P.Q. 411, 419, 1982 WL 51043 (N.D.Calif.1982) (relevant inquiry in determining secondary meaning is whether plaintiff restaurant's interior decor is known in the defendant restaurant's *local trade area;* court placed "great weight" on the fact that defendant's restaurant was over 400 miles away from the nearest of plaintiff's restaurants, and was not yet directly competing with plaintiff for customers.). At best, this evidence carries minimal weight.

### (e) *Amount Of Sales.*

Plaintiff produced evidence that individual Buca restaurants average approximately $3,000,000 in annual sales. While Buca, Inc., has not realized a profit due to investment in market expansion and staff, the evidence presented shows sales per restaurant ranks Buca among the highest in sales of multi-unit casual dining Italian restaurants, especially restaurants that offer only one meal per day. However, a significant amount of sales alone does not indicate that Buca's trade dress has acquired secondary meaning. *See Aromatique,* 28 F.3d at 873 ("Because the proper inquiry is whether the evidence demonstrates that the purchasing public identifies the asserted mark with the source of the product, sales figures alone are inadequate to establish a connection between a product and its source.") (citation omitted); *Winning Ways,* 913 F.Supp. at 1472 ("[S]ales figures are

subject to numerous interpretations"). Thus, the amount of Buca's sales is only limited evidence of secondary meaning. Moreover, because Buca's sales are not in the relevant target market, Buca's evidence of sales carries little weight in establishing secondary meaning in the Kansas City/Wichita market.

### (f) *Proof Of Intentional Copying.*

Plaintiff points to the following evidence as proof of defendants' intentional copying of Buca's trade dress: On his first day of work, Lemle, hired by Guzzo and Kerwin to aid in the execution of a new 1940's–1950's Southern Italian style restaurant concept, traveled with Kerwin and Guzzo to the Buca restaurant in Eden Prairie, Minnesota. They were accompanied by William Yarger of Yarger & Associates, Inc., who defendants had hired as the architect and designer of Gambucci's. The group spent two consecutive days eating dinner at Buca restaurants and, during these dinners, discussed the concept of a new Italian restaurant to be created by Tippin's. Lemle made four more trips to Buca in less than a three-month period. Guzzo made six more trips to Buca before Gambucci's opened. Kerwin accompanied Guzzo on two of those additional trips. Lemle, Guzzo, and Kerwin all testified that these trips to Buca were for the purpose of research and development in creating the Gambucci's concept.

The court finds that the foregoing evidence does not establish intentional copying on the part of defendants. Buca has simply assumed that because defendants viewed the plaintiff's restaurants a number of times, that defendants deliberately copied the look and trade dress of the Buca restaurants. Defendants, however, have visited numerous Italian restaurants. Moreover, Roberts, chairman of Buca, Inc., and the developer of the Buca concept, conceded that he had visited over one-hundred Italian restaurants during the course of his research and development of the Buca concept. Under the circumstances, the court finds that the evidence of

plaintiff has made out a showing of trade dress as to the exterior and interior of its buildings, we conclude that plaintiff still would be unable to demonstrate a likelihood of success on the merits of its infringement claim. As our findings reflect, *supra* and *infra,* plaintiff has failed to prove

that (1) its restaurant trade dress is inherently distinctive or distinctive by having acquired secondary meaning, and (2) there is a likelihood of confusion between Buca and Gambucci's restaurants.

defendants' visits to Buca restaurants is not significantly probative of intentional copying.

As further evidence to support a finding of intentional copying, plaintiff points to Wilson's testimony that Kerwin told her one of the things he liked about Buca was the amount of objects on the walls. Plaintiff also emphasizes Wilson's testimony that Kerwin and Guzzo wanted the design to be "theatrical, fun, family oriented, and exciting to look at. Have lots of props and visual elements for people to entertain themselves with while they eat or wait." Transcript at 452–53. Plaintiff notes that Wilson had seventy-two photographs of Buca at the time she was devising Gambucci's design features, that have since been destroyed or purged. Wilson testified that she used at least one Buca photograph as a source for the application of the color wash for the walls of Gambucci's restaurant.

The court finds Kerwin's comment to Wilson that he "liked the amount of objects on the walls" insufficient to support a finding of intentional copying. Furthermore, Wilson's comment regarding Kerwin and Guzzo's desire for a "theatrical, fun restaurant with lots of props and visual elements" was made in response to the question by plaintiff's counsel, "what ... was the most specific instruction that you had from [Kerwin and Guzzo] up until the generation of Exhibit 550 [the three different story lines]?" Thus, this evidence tends to show that Wilson was not specifically instructed to copy Buca's trade dress. The mere fact that Wilson had seventy-two photos of Buca restaurants among the "thousands" of restaurant photos she viewed in working on the project does not amount to evidence of intentional copying. The record is devoid of any evidence that Wilson specifically copied the look of Buca. Though Wilson admitted that she used one Buca photo as a source for the color wash technique on Gambucci's walls, such admission is of limited value, as plaintiff is not seeking to protect as trade dress the painting *technique*, but instead the color of the paintwash on the walls. Additionally, the court finds that no negative

inference may be drawn from the fact that the seventy-two Buca photographs were destroyed, as the only evidence presented was that they were purged in the normal course of business.

■■■ Finally, Buca argues "it is difficult to accept that in light of the overwhelming parallel features between these two restaurants, there was no intention to copy Buca's overall look and trade dress." Plaintiff's Proposed Findings and Conclusions at 38. Plaintiff enumerates the following list of features that the two restaurants have in common: Both restaurants use a vertical neon sign showing the name of the restaurant and a filled glass of wine; both have the words "air-conditioned" and "cocktail lounge" advertised in neon; both advertise "wine," "cocktails" or "lounge" on the exterior; both have Greco–Roman statuary on each side of the entrance; both have a very large table with a special name; both have walls painted with brightly colored fruits and vegetables which are similar in appearance; both have walls painted in red or gold wash; both use a pulpit host/hostess podium in the lobby; both display round bread in the lobby; both contain unmatched antique fixtures; both use faux reproductions of famous Greco–Roman artwork with irreverent or humorous modifications or decorations; both have an arched ceiling of Renaissance paintings showing cherubs; both contain interior padded doors; both have unmatched curtains; both display bowling pins and Italian pennants; both have draperies in interior doorways; both have shadowboxes and shelves filled with collectibles and knick-knacks; both have gold-gilded frames and mirrors; both have areas with period kitchen tables; and both use Christmas tree lights year-round, though Gambucci's Christmas lights are limited to the bar area.[6]

The court acknowledges that many of the component items of decor in Gambucci's are indeed similar to those found in Buca. The court, however, is of the view that the similarities in decor do not weigh compellingly in favor of a finding of intentional copying. We

---

**6.** Guzzo, in his testimony, stated that Gambucci's restaurants do not display anything that is irreverent, do not have a kitchen table for patrons in

the working kitchen, and use curtains that match each room.

find the following concrete facts weigh heavily against any circumstantial inference of intentional copying: Defendants paid Yarger & Associates $40,000 to come up with a design theme; Wilson spent well in excess of 300 hours working on the design project; Wilson and Yarger testified that they were not instructed to copy, nor did they copy, Buca's decor; and Wilson and Yarger further testified as to the many and varied sources, aside from Buca, that provided ideas and inspiration for the design of Gambucci's.[7]

Moreover, the evidence also shows a number of differences in the decor of the two restaurants. Gambucci's presents a theme premised on the idea that an Italian family, the Gambucci's, converted their house into a restaurant. There are numerous rooms throughout the restaurant, each reminiscent of a particular room in a home, with each room decorated with elements characteristic of that type of room. Guzzo testified, for example, that the den room is decorated with informal objects, while the formal living room is decorated with fine china and expensive objects. In contrast, Buca restaurants carry the same decor elements throughout each room, and the restaurant is not intended to look like someone's home. The foregoing evidence weighs against a finding of intentional copying.

In sum, after weighing the evidence, the court concludes that plaintiff has not met the required showing to establish that its restaurants have acquired secondary meaning, to wit, that consumers in the relevant market associate the trade dress of Buca restaurants with a single source. Accordingly, the court concludes that plaintiff has failed to demonstrate a substantial likelihood that it will ultimately prevail on the merits of its claim of unfair competition in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

### B. Likelihood Of Confusion.

The plaintiff in a trade dress action must show that "potential customers are likely to be confused by the defendant's trade dress into thinking that the defendant is affiliated, connected or associated with the plaintiff or that the defendant's goods originated with, or are sponsored or approved by the plaintiff." *Western Chemical Pumps,* 989 F.Supp. at 1124 (quoting *Vornado,* 58 F.3d at 1502–03). Courts consider a number of factors to determine whether a likelihood of confusion exists in trademark infringement cases, including:

(a) the degree of similarity between the marks, including the marks' appearance, pronunciation, suggestion, and manner of display;

(b) strength or weakness of the plaintiff's mark;

(c) the intent of the alleged infringer in adopting its mark;

(d) similarities and differences of the parties' goods, services and marketing strategies;

(e) the degree of care likely to be exercised by purchasers of the goods or services involved; and

(f) evidence of actual confusion, if any.

*Heartsprings, Inc. v. Heartspring, Inc.,* 143 F.3d 550, 554 (10th Cir.1998) (citing *Universal Money Ctrs., Inc. v. American Tel. & Tel. Co.,* 22 F.3d 1527, 1530 (10th Cir.1994)). With only minor modifications, the foregoing factors provide guidance in evaluating the likelihood of confusion in trade dress cases as well. *See Winning Ways,* 913 F.Supp. at 1473.

Some of these factors may prove more relevant than others, depending on the facts of each case. *Heartsprings, Inc.,* 143 F.3d at 554. No one factor is dispositive, and the final determination of likelihood of confusion must be based on consideration of all relevant factors. *Id.* (citing *Beer Nuts,* 805 F.2d at 925). In every case, however, the

---

7. Wilson testified that certain elements of Gambucci's decor were not created by the design team, *i.e.,* the painted eggplants, the pulpit hostess stand, the vertical sign, the cherubs on the ceiling, the artificial flowers, and the interior wrought iron. Plaintiffs imply that because the design team did not include these items in their design concept, that defendants themselves must have intentionally copied them from Buca. Both Guzzo and Kerwin, however, specifically testified that they did not copy Buca. Transcript at 184, 498. We find Guzzo and Kerwin's unequivocal statements weigh against a finding of intentional copying.

key inquiry is whether the consumer is "likely to be deceived or confused by the similarity of the marks." *Id.* (citing *Two Pesos,* 505 U.S. at 780, 112 S.Ct. 2753).

Buca must demonstrate that the decor of Gambucci's restaurants creates a likelihood of confusion on the part of an appreciable number of ordinary purchasers exercising due care in the circumstances. *Western Chemical Pumps,* 989 F.Supp. at 1124 (citing cases). Likelihood of confusion is examined from the perspective of the purchaser. *Vornado,* 58 F.3d at 1503.

### 1. *Similarity of the Trade Dress.*

As noted above, many of the elements comprising Buca's trade dress also are present in defendants' restaurants. Each trade dress, however, must be considered as a whole. *Heartsprings, Inc.,* 143 F.3d at 554 (citing *Universal,* 22 F.3d at 1531 (regarding trademarks)). Even if the trade dress is similar, the likelihood of confusion is reduced if the two trade dresses, taken as a whole, are visually distinct. *Id.* (regarding trademarks). After a considered review of photographs and video comparing the trade dress of both parties' restaurants, the court concludes that this factor weighs in favor of defendants. We find that although many of the decor elements are strikingly similar, the overall look of the defendants' trade dress, when considered as a whole, is visually distinct from that of plaintiff. Specifically, we find that while Buca, through the use of low ceilings, has created a cozy, intimate atmosphere so its customers feel as though they are dining in a basement, Gambucci's does not create such an atmosphere, and uses, in various places, ten, twelve, and fifteen foot ceilings, and in other areas, no ceiling at all (the exposed roof structure is painted black). The dining rooms in Gambucci's are bigger than in Buca restaurants. As previously noted, Gambucci's interiors are designed to look like the home of an Italian immigrant family, with each dining room decorated to resemble a particular room of a house. Buca restaurants do not create this theme. These distinctions in the overall look of the two restaurants militates against a likelihood of confusion.

### 2. *Strength of the Trade Dress.*

"To determine the relative strength of plaintiff's trademark, we place the mark in one of five categories of increasing distinctiveness and strength: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful." *Heartsprings,* 143 F.3d at 555 (citing *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992)). We previously concluded that Buca's trade dress is best categorized as "descriptive." A trade dress classified as descriptive falls within the second lowest category in the hierarchy of increasing distinctiveness. Accordingly, we find plaintiff's trade dress is not highly distinctive, and is not relatively strong. Thus, this factor weighs in favor of defendants.

### 3. *Intent of Gambucci's in Adopting its Trade Dress.*

"If an alleged infringer adopted its mark for the purpose of deriving benefit from a plaintiff's existing mark, this intent weighs firmly in the plaintiff's favor." *Heartsprings,* 143 F.3d at 556. "The proper focus [remains] whether defendant had the intent to derive benefit from the reputation or goodwill of plaintiff." *Universal,* 22 F.3d at 1532. "Conversely, if the evidence indicates a defendant did not intend to derive benefit from a plaintiff's existing mark, this factor weighs against the likelihood of confusion." *Heartsprings,* 143 F.3d at 556.

The evidence of record before the court fails to demonstrate that the defendants adopted their trade dress for the purpose of deriving benefit from Buca's existing trade dress. Plaintiff has made no showing that the defendants intended to capitalize on the reputation or goodwill of Buca. To the contrary, the evidence indicates that defendants spent approximately $40,000 in fees for the development of a unique theme. Additionally, Wilson spent in excess of 300 hours developing this theme, and she consulted numerous and diverse sources for inspiration. Both Wilson and Yarger testified that they were never instructed to copy Buca's trade dress, and that they did not in fact copy Buca's trade dress. There is no evidence that defendants plagiarized the trade dress of Buca's product. Plaintiff has presented

mere speculation and assumption. The court finds this factor weighs against a finding of likelihood of confusion.

### 4. Similarities and Differences of the Goods, Services and Marketing Strategies.

Both parties operate in the mid-priced casual Italian dining segment, both have family-style service, and both appear to have similar marketing methods. Because the two parties operate in separate markets, however, we conclude that the likelihood of confusion is slight. *See T.G.I. Friday's,* 405 F.Supp. at 707 ("[W]hile the services and marketing methods of these respective parties are essentially identical, we believe that reasonably prudent consumers in the Baton Rouge market would not be likely to confuse 'Ever Lovin' Saturdays' with 'T.G.I. Friday's' since plaintiff has never directly competed with [defendant] in this area and has never advertised locally.") Although plaintiff contends that it plans to open a Buca restaurant in the Kansas City area in the autumn of 1998, such evidence is of minimal value in proving likelihood of confusion. *See Universal v. AT & T,* 797 F.Supp. 891, 895 (D.Kan. 1992) ("Although UMC contends that it will soon be offering some form of 'Mastercard,' such evidence is irrelevant to the inquiry at hand. Specifically, 'the intent of the prior user to expand or its activities in preparation to do so, unless known by prospective purchasers, does not affect the likelihood of confusion.'") (quoting *Lang v. Retirement Living Publishing Co., Inc.,* 949 F.2d 576, 582 (2d Cir.1991)).

### 5. Degree of Care Exercised by Consumers.

Another factor to be considered is "the degree of care likely to be exercised by purchasers." *Beer Nuts, Inc. v. Clover Club Foods Co.,* 805 F.2d 920, 925 (10th Cir.1986). "The general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods, is the touchstone." *Beer Nuts,* 711 F.2d at 941 (citations omitted). Inexpensive items which are purchased on impulse or with little care are more likely to be confused than expensive items which are chosen carefully. *Id.*

Both Gambucci's and Buca fall within the restaurant industry classification of "Italian casual dining." Both are generally considered to be moderately-priced restaurants with similarly priced menu items. Plaintiff presented evidence, through its expert Richard Good, that the degree of care likely to be exercised by restaurant patrons who visit a Buca or a Gambucci's is low. Defendant has presented no contradictory evidence. Based upon the moderate outlay for a meal in this price range, and based upon Good's uncontroverted opinion, the court finds that consumers would exercise a relatively low degree of care when purchasing either plaintiff's or defendants' products. Thus, this factor weighs in favor of plaintiff.

### 6. Actual Confusion.

The best evidence of likelihood of confusion in the marketplace is actual confusion. *Packerware Corp. v. Corning Consumer Prods. Co.,* 895 F.Supp. 1438, 1451 (D.Kan. 1995) (citing *Paramount Pictures Corp. v. Video Broadcasting Systems, Inc.,* 724 F.Supp. 808, 816 (D.Kan.1989)). On the other hand, the absence of evidence of actual confusion does not necessarily mandate a finding that there exists no likelihood of confusion. *Id.* (citing *Beer Nuts,* 805 F.2d at 928). "Where the products sold by the parties have been available contemporaneously for only a short time, evidence of actual confusion is particularly apt to be unavailable and its absence under such circumstances is understandable and especially unimportant." *Id.* (citing *Centaur Communications v. A/S/M,* 830 F.2d 1217, 1227 (2nd Cir.1987)).

Here, plaintiff has submitted no evidence of actual customer confusion. Although both parties have been operating their restaurants with their current trade dress for over one and one-half years, the court finds that they have not been operating in the same local market. Under the circumstances, this factor should be accorded little value in assessing likelihood of confusion in the marketplace.

After considering together and weighing each of the factors set forth above, the court finds that on the present record, the plaintiff

has failed to sustain its burden of showing that potential customers are likely to be confused by the defendants' trade dress into thinking that Gambucci's is affiliated with Buca or that Gambucci's originated with, or is sponsored or approved by Buca. Establishing "a potential" for confusion is insufficient; plaintiff must demonstrate "a likelihood" of confusion. *See Western Chemical Pumps,* 989 F.Supp. at 1127 (citing *Versa Products Co., Inc. v. Bifold Co. Ltd.,* 50 F.3d 189, 200–01 (3rd Cir.) (possibility of confusion insufficient), *cert. denied,* 516 U.S. 808, 116 S.Ct. 54, 133 L.Ed.2d 19 (1995)). Accordingly, the court concludes that plaintiff has failed to demonstrate a substantial likelihood that it will ultimately prevail on the merits of its claim of unfair competition under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).[8]

## II. *Irreparable Injury.*

The likelihood of success is only one factor to be considered on a motion for preliminary injunction; irreparable injury is equally important. *GTE Corp. v. Williams,* 731 F.2d 676, 678 (10th Cir.1984). Trademark infringement "by its very nature" results in irreparable harm to the owner of the mark, unless the trademark is already weak. *Amoco Oil, Co. v. Rainbow Snow, Inc.,* 809 F.2d 656, 663 (10th Cir.1987). Because a trademark represents intangible assets, such as reputation and goodwill, irreparable injury will be presumed upon a showing of trademark infringement. *Id.* at 663–664. Here, because plaintiff has failed to demonstrate a likelihood of consumer confusion, and because the court has determined that plaintiff's trade dress is relatively weak, the court finds that irreparable injury to the plaintiff cannot be presumed.

Absent this presumption, Buca's evidence of irreparable harm that it will suffer if Gambucci's continues to operate with its current trade dress is somewhat conjectural and, according to plaintiff, "intangible." Plaintiff's Proposed Findings and Conclusions at 51. Buca's expert, Richard Good, testified that: (1) the typical restaurant customer "might

end up cross-shopping" by visiting both restaurants and could be confused because of the similarity of the concepts; (2) a customer may have a bad experience at Gambucci's, for whatever reason, and confusion between the two restaurants may cause the customer not to patronize Buca; (3) since Gambucci's is the first restaurant in the Kansas market, there could be a backlash against Buca if people thought Buca copied Gambucci's; and (4) if customers had a good experience at Gambucci's, that could constitute a "preemptive strike," and discourage them from visiting a Buca because they found the same combination of elements at Gambucci's.

The court finds Good's first three enumerated harms to Buca improbable in light of our previous determination, supra, that there is little likelihood of customer confusion between the two restaurants. We conclude that the fourth enumerated harm is likewise doubtful, given our finding that the overall look of the two restaurants is not confusingly similar.

## III. *Balancing of Hardships.*

In considering a motion for preliminary injunction, the court must examine whether the injury to the plaintiff outweighs the harm which granting the injunctive relief would inflict on the defendant. *Packerware Corp.,* 895 F.Supp. at 1453. Based upon the evidence, we find that the balance of harms favors defendants. The record shows that unless the status quo is maintained until this case is decided by a jury on the merits, Gambucci's ability to continue in operation would be seriously impaired. Defendants presented uncontroverted evidence that if an injunction were to issue under the terms as requested by plaintiff, defendants would be forced to temporarily shut down both Gambucci's restaurants for a period of time while they planned, designed, and executed a new restaurant concept. Defendants further presented evidence that they would incur over $2.4 million in expenses if an injunction were to issue. Kerwin stated that this figure is, in

---

**8.** Though plaintiff has asserted additional federal and common law claims in its complaint, plaintiff clarified during closing arguments that it is only proceeding under § 43(a) of the Lanham Act in its request for a preliminary injunction. Consequently, the court will not consider the criteria for granting a preliminary injunction with respect to plaintiff's other claims.

his opinion, conservative, and does not include any of the costs of research and development of a new concept, or any of the associated renovation costs. This evidence was uncontroverted by plaintiff. Thus, the court finds, based upon the evidence before us, that a preliminary injunction would impose substantial hardship on defendants. In addition, the court notes that plaintiff, during closing arguments, was unprepared to commit itself to posting any bond in excess of $100,000. The court finds such a bond amount insufficient in light of the evidence presented regarding defendants' injuries were an injunction to issue.

## IV. *Public Interest.*

█ It is well established that one of the primary purposes in enacting the Lanham Act was to ensure that consumers are not deceived as to the source of goods purchased. *See, e.g., Ameritech, Inc. v. American Info. Technologies Corp.,* 811 F.2d 960, 964 (6th Cir.1987). In view of the court's previous conclusion that plaintiff has not established a likelihood of significant consumer confusion, the court does not believe that the public interest demands preliminary injunctive relief. Rather, the court finds that the public interest is best served, at this stage of the proceedings, by allowing defendants to continue to operate their restaurants with their current trade dress.

In conclusion, the court finds that plaintiff has failed to establish its entitlement to the extraordinary relief of a mandatory injunction. Plaintiff simply has not shown that on balance, the four factors "weigh heavily and compellingly in [Buca's] favor." *SCFC ILC, Inc. v. Visa USA,* 936 F.2d 1096, 1099 (10th Cir.1991). *See also Paul's Beauty College v. United States,* 885 F.Supp. 1468, 1471 (D.Kan.1995).

IT IS THEREFORE ORDERED that plaintiff Buca, Inc.'s motion for preliminary injunction (Doc. # 34) is denied.